1228

HERMAN J. ROMER AND JOYCE M. ROMER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

HERMAN J. ROMER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

JOYCE M. ROMER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 51606, 51607, 51608.   Filed September 27, 1957.

*Ernest R. Mortenson, Esq.*, for the petitioners.
*Arthur Clark, Jr., Esq.*, for the respondent.

1234

## OPINION.

Turner, *Judge:* Based upon a stipulation by the parties that petitioner Herman J. Romer was required "to live in the hotel since [his] services were required on a 24-hour basis," it is the contention of the petitioners that the food and lodging supplied to petitioners were for the convenience of the employer and that that portion of their compensation which represented the board and room furnished was not income to them. In *Charles A. Brasher,* 22 T. C. 637, and *Joseph L. Doran,* 21 T. C. 374, after pointing out that, under section 22 (a) of the Internal Revenue Code of 1939, gross income includes "compensation for personal service * * * of whatever kind and in whatever form paid," we held that where living quarters and food provided for an employee are a part of his compensation for the services rendered, their value is a part of his gross income, and the fact that such lodging and food may also be regarded as having been supplied for the convenience of the employer does not render the allowance other than compensation, or eliminate it from the employee's gross income.

It was the testimony of Romer that he was furnished with room and board as a part of his salary, and that the same was true as to some 200 other employees who lived in the hotel. It was his testimony, also, that the amounts at which the room and board so furnished were

included in compensation were the same in his case as that of all other employees, and there is no proof or showing as to the relation, if any, between the amount included in compensation as representing room and board and either the value of the room and board furnished the particular employee or the cost thereof to the hotel. It would be extremely doubtful, for instance, that the value of or cost to the hotel of the quarters furnished to petitioner as assistant manager would be the same as that supplied to a hotel maid or some other service employee, and yet the amount of compensation attributed to the room and board furnished is the same for all. Furthermore, there is no claim or contention that the other employees receiving as a part of their compensation such same allowance in respect of room and board were required to live in the hotel, or that the room and board furnished to them was furnished for the convenience of the employer. In that connection, it is to be noted that as to petitioner Joyce Romer there is no evidence and no stipulation to the effect that she, as an employee, although receiving during some if not all of the years herein the same allowance for room and board as petitioner Herman J. Romer, was required to live in the hotel for the convenience of her employer.

In his determination of the deficiencies, the respondent has increased the taxable income of the petitioners only by the fixed or stated amount agreed upon between the hotel and the employees, possibly under State law or regulations, as representing the room and board furnished. It may well be that the actual value of such room and board was in excess of such stated amount, but, if so, the respondent has made no claim therefor, and has included as compensation only that amount in respect of room and board which according to petitioner represented compensation.

The petitioners cite and rely on *Diamond* v. *Sturr*, 221 F. 2d 264. The court in that case did hold that the food and lodging there considered which had been received by the taxpayers in the course of their employment were "clearly for the convenience of their employer," and for that reason were not taxable to them as compensation. Certainly as to the amounts herein representing the food and lodging furnished to Joyce Romer, the case of *Diamond* v. *Sturr* is not in point, since as we have pointed out there is no showing of record on which the conclusion could be based that the room and board furnished to her was for the convenience of the employer any more than was the compensation which was paid to her in cash.

As to Herman Romer, there are also facts of record which in our opinion supply an adequate basis for distinguishing the instant case from *Diamond* v. *Sturr*. If, however, the stipulation that Royce "required petitioner to live in the hotel since the petitioner's services were required on a 24-hour basis" is to be construed as meaning that the

board and room furnished to him was furnished for the convenience of the employer, it would appear that in principle the *Brasher* and *Doran* cases are in conflict with *Diamond* v. *Sturr*. In such posture of the case, we feel that we must and, with due deference to the Court of Appeals for the Second Circuit in *Diamond* v. *Sturr*, we do disagree with the rule of law pronounced in that case, and adhere to our pronouncements in the *Brasher* and *Doran* cases. The amount here involved was allowed or furnished as compensation. The allowance was the same for all employees, and it has not been shown to have been based on the value or cost of the board and room actually furnished, and must, we think, be held to have been gross income within the meaning of section 22 (a).

According to their income tax returns, the gross income of the petitioners for 1947 was $14,533.87, consisting of compensation received from the Huntington Hotel in the amount of $14,280.12, dividends of $150, and capital gains in the amount of $103.75. The facts show that during the same year they made total deposits in their bank account, all by check, of $36,799.56, and the net increase in their bank balance as between January 1, 1947, and December 31, 1947, was $17,152.54. Based on those deposits, the respondent determined that, as reported in their returns, the petitioners had understated their income by $12,-814.51. In their petitions, the petitioners have alleged that their income as reported was computed in accordance with the method of accounting regularly employed in keeping their books and that such method of accounting clearly reflected their income. Based on that allegation, they argue, on brief, that the respondent's determination was contrary to the requirements of section 41 of the Internal Revenue Code of 1939, and under *Helvering* v. *Taylor*, 293 U. S. 507, was arbitrary and invalid.

By section 41, it is provided that the net income of a taxpayer "shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no such method of accounting has been so employed, or if the method does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income."

The petitioners filed their returns upon the basis of a calendar year accounting period, and the respondent in his determination made no change therein. And though the returns do not so state, and we find no evidence directed to any method of accounting regularly employed by the petitioners in keeping any books of account, it is patent, we think, that the petitioners reported the income which they did report by the cash receipts and disbursements method of reporting in-

come, and the respondent made his determination on that same basis. It would thus appear that the question which we have here is not a question as to the proper method of accounting for and reporting of income under section 41, but is whether the petitioners received income which they did not account for and report under any accounting method.

Under the provisions of section 54 (a) of the Internal Revenue Code of 1939, "every person" liable to Federal income tax is required to "keep such records, render under oath such statements, make such returns, and comply with such rules and regulations, as the Commissioner, with the approval of the Secretary, may from time to time prescribe." And by section 29.54–1 of Regulations 111, promulgated thereunder, it is provided that every such person "shall, for the purpose of enabling the Commissioner to determine the correct amount of income subject to the tax, keep such permanent books of account or records * * * as are sufficient to establish the amount of the gross income and the deductions, credits and other matters required to be shown in any return."

There is no showing or indication of record that the petitioners kept and maintained any books of account and certain it is that the books of account which were kept, if any, did not by any manner or means reflect all of their receipts and disbursements made in connection with transactions indulged in for the purpose of gain. And, insofar as we are apprised, the only records maintained with regularity and continuity and covering their receipts and disbursements to any appreciable extent were their check stubs, canceled checks, and bank statements. In fact, it was not until sometime during 1947 that the check stubs began to show any statement of the purposes for which any of the checks were drawn. At no time has that practice been extended to checks drawn to cash, and so far as we have been able to determine there has been a complete absence of notations showing the sources of the deposits. The facts also show that by 1947 petitioner had been betting on horseraces for approximately 8 years, that this activity continued during 1947 with substantial frequency, and with respect to his betting transactions it is the testimony of petitioner himself that no records were kept or accounts maintained at any time. It was under these conditions and circumstances, and with only $14,533.87 of reported income to account for total bank deposits of $36,799.56 and a net increase of $17,152.54 in their bank balance during the year, that respondent made his determination of unreported income by reference to petitioner's bank deposits.

Where, as here, a taxpayer has failed to keep adequate books of account, as required by the regulations under section 54 (a), the Commissioner must determine or verify the income from the records

or sources that are available, and his determination of income by reference to deposits in the taxpayer's bank account has been approved in numerous cases. *Goe* v. *Commissioner*, 198 F. 2d 851, certiorari denied 344 U. S. 897; *Halle* v. *Commissioner*, 175 F. 2d 500; *Hague Estate* v. *Commissioner*, 132 F. 2d 775, certiorari denied 318 U. S. 787, affirming 45 B. T. A. 104; *Hoefle* v. *Commissioner*, 114 F. 2d 713; *Mauch* v. *Commissioner*, 113 F. 2d 555; and *Joseph L. Calafato*, 42 B. T. A. 881, affirmed per curiam 124 F. 2d 187. In *Hague Estate* v. *Commissioner, supra*, it was said that "while such evidence, of course, is not conclusive, deposits in checking accounts are so often made up of income that where, as here, that is the fair inference to be drawn from the facts it was proper to give it effect. One consequence is that the determinations of the Commissioner were not arbitrary and capricious and so gave adequate support for the computation of the tax unless the taxpayer could show them to be wrong."

As to the results of Romer's gambling operations, petitioners placed their reliance on Romer's testimony. This testimony was not only uncorroborated and self-serving, but in most instances where definite and clarifying facts were asked for, it was vague and indefinite. He admitted that from time to time he had substantial winnings from his horseracing bets, but testified that in the main these winnings were paid to him in cash and were placed in his hotel safety-deposit box and not in his bank account. He also admitted that from time to time he had substantial amounts of accumulated winnings in the said box, but he could not remember specific "wins." There was no testimony as to the exact amount of cash in the box on any particular date, and there is nothing of record directed to the amount of money in the box at the beginning or end of any of the years herein, or any other year. In fact, except possibly for 1949, his testimony was no more definite as to the net win or loss results for any given year than that at the end of the year he was "usually" the loser.

We have not been able to find of record any explanation as to how, in the circumstances described by him and with admitted gross income of $14,533.87, he could pay his living and personal expenses during the year, sustain a net loss on extensive gambling operations, and at the same time experience a net increase during the year in his bank balance of $17,152.54. In fact, the petitioner has not given any testimony or supplied any evidence tending to show nonincome sources for any of the deposits supplying the basis for the increase in the balance in his bank account during the year, and certain it is that the increase is not accounted for by his reported and admitted income for the year.

Even so, however, the facts of record are quite revealing. In addition to his admitted gambling transactions with bookmakers, petitioner

also admitted, in the course of his testimony, that he did considerable betting at the local tracks and that "probably" he had "won large sums of money at the tracks." Although it is his testimony that these winnings, along with his winnings from the bookmakers, went into his cash box and did not find their way into his bank account, they could have been a source for a part of the increase in net deposits during 1947, as has been illustrated by the $1,000 check deposited in his bank account in February 1949, the original source of which was stated to have been cash taken from the hotel box wherein he kept his cash winnings. Aside, however, from such possibilities or probabilities, there is direct evidence that at least $8,315, or approximately half of the net increase in petitioner's bank balance for 1947, was accounted for by three checks and a money order received from parties engaged in taking bets on horses or in placing such bets on a commission basis, and with whom petitioner conducted some of his gambling operations, and as to one such check, petitioner would not deny that it could have represented winnings.

On the evidence of record, we are satisfied that for the year 1947 petitioner has failed to account for substantial amounts representing net winnings from his gambling operations; that such unreported income supplies the basis for the major part, if not all, of the net increase in his bank balance during the year, and in the absence of any convincing proof that the amount of such unreported income was less than the $12,814.51 determined by the respondent, his determination of that amount is sustained. Further, his determination was not arbitrary and capricious, as petitioner contends, but, on the facts, was reasonable and proper. *Goe* v. *Commissioner, supra; Hague Estate* v. *Commissioner, supra;* and cases cited above. *Helvering* v. *Taylor, supra,* cited and relied upon by petitioner, is not in point.

For 1949, only a part of the unreported income as determined by the respondent was based on unexplained deposits made to petitioner's bank account, and the parties are now agreed that a total of $585.88, representing four items which were deposited in the account, did not represent income and should be eliminated. They are also agreed that the amount of unexplained deposits should further be reduced by $761.76 as representing petitioner's salary check for February 28, 1949, the amount of which was reported by petitioners in their return.

The principal addition to income made by the respondent in his determination for 1949 was the $30,000 of net winnings admittedly paid over by Epstein in May 1949 for credit to petitioner's Regulated Commodity Account with Rice & Company, $20,000 of which is shown to have reached petitioner's bank account through the deposit of a check in that amount received by petitioner in the closing of his Regulated Commodity Account with Rice & Company in July 1949.

Petitioner does not dispute the $30,000 of net winnings with Epstein at May 9 and 10, 1949, the dates of the payment thereof to his account with Rice & Company. Furthermore, his admissions, in the course of his testimony, supply ample basis for the conclusion that he had additional winnings which in the aggregate were substantially greater than the additions to income not identified as to source by the respondent in his determination.

As now made on brief, petitioner's claim is that he has established by proof of record losses of $37,456.50 on wagers during the year, which amount is in excess of and completely absorbs the amount of unreported income as determined by the respondent. Of the said $37,-456.50, it is his claim that $23,297.98, representing the proceeds of 22 checks cashed from his bank account, was wagered and lost in its entirety either by bets made at local tracks or with local bookmakers during the year, and that the $14,158.52 shown by Rice & Company as paid out in "currency" was at petitioner's direction paid to Epstein to apply on accumulated losses he then had with Epstein.

As to 12 of the 22 checks and the proceeds thereof, amounting in the aggregate to $5,461, there is in fact no issue, since the amounts of these checks have been included in full by the respondent in the amount he did allow in his determination to cover gambling losses. They represent 8 checks, for a total of $4,300, made payable to cash and cashed at Santa Anita and Hollywood Park race tracks, 1 check for $200, drawn payable to one of the bookmakers with whom petitioner did business, and 3 checks, for a total of $961, drawn payable to cash or to Florence Perry, all 3 of which were endorsed by Florence Perry.

Of the 10 checks remaining, 7, for a total of $7,703.50, are claimed to have been checks delivered to a bookmaker by the name of Quickensted to cover losses sustained by petitioner in his wagering with Quickensted during the year; 1 check, dated July 9, 1949, was for $200 and was drawn payable to the Huntington Hotel; another check, dated August 1, 1949, was for $4,000 and was made payable to H. J. Romer; while the final check was for $5,933.48, dated March 28, 1950, and was made payable to Daniel F. Rice. Of these 10 checks only the last 3 are in evidence. The check stubs were not produced. The 3 canceled checks which are in evidence do not of themselves show the purposes for which they were drawn or the uses to which the proceeds were put, and none of the parties receiving and cashing any of the checks were called to testify.

Having kept no books or records of any kind covering or showing his horse betting transactions and the results therefrom, and having offered no independent evidence to show that the amounts in question were in fact lost in his wagering operations, petitioner is left to his own self-serving, uncorroborated testimony to establish the losses as claimed

and to show that he did not have net taxable income, as the respondent has determined. As to the said 10 checks, it is true that he professed to a clear and distinct knowledge and recollection of the purpose for which each check was drawn and that the amount of each such check in toto represented a loss or losses in his betting operations. We followed his testimony with the greatest of care and attention, and still having grave doubts as to the actual facts, propounded some questions on our own motion, and we are satisfied that petitioner's recitation of the purposes for which the checks were drawn and of the disposition of the proceeds was prompted not according to his present knowledge and recollection of facts, but by the exigencies of his current situation, taxwise, and that it did not represent a true accounting of the check proceeds.

The seven checks claimed to have been delivered to Quickensted were missing, and though drawn in odd and varying amounts, petitioner, by reference only to the dollar charges on his bank statement, claimed a definite recollection that all of the checks had been made to cash and reflected losses in toto; that he remembered, among other things, that the checks had been given to Quickensted, because Quickensted was the bookmaker he was doing business with during the period in which the checks were drawn and cashed; that each of the checks, when cashed, bore the endorsement of Jones & Coutts because that was the filling station where Quickensted cashed his checks; and that he, petitioner, had turned his canceled checks over to an accountant who was representing him, and these particular checks had not been returned, which may have been because the accountant had some tie-in with or was protecting Jones & Coutts.

Aside from his betting with Epstein, petitioner, by his own account, conducted most of his horse-betting operations from his hotel cashbox, in which he would place his winnings and from which he would take money for bets. It was his testimony that he withdrew money for betting on horses from his bank account only when the money in the cashbox had been exhausted, which testimony, it is said, demonstrates that the particular checks here in question must reflect betting losses to the extent of the face amounts thereof, the implication, as contrasted with proof, being that all of the money from winnings during the year which was placed in the cashbox was exhausted by other losing bets and that the claimed losses represented by the checks under consideration were losses over and above the losing bets which had absorbed his cashbox winnings.

No effort was made to show, and we do not know, what amount of money was in the cashbox at the beginning or end of 1949, but by petitioner's admissions, he had from time to time in 1949 substantial winnings which were placed in the box in cash. One such instance was

in January, when on one of his first wagers with Epstein he collected $5,000 to $6,000 from Epstein's local representative, which winnings were placed in the box. Occasionally he would count the money in the box, and the most he "remembered" on any one count in 1949 was $8,000, but he made no record and had no memory of the winnings placed in the box or the amounts withdrawn in the intervals, or of the dates when the money was counted. And even if we assume that the proceeds of some or all of the missing checks were used in connection with petitioner's wagering with Quickensted, there is no indication or showing that some of the winnings which did go into the cashbox were not on bets with Quickensted and could not offset any losses petitioner may have paid to Quickensted by check. On the other hand, we do know, from petitioner's testimony, that the source of the money represented by a $1,000 check which was deposited in his bank account in February 1949 had been the money in the cashbox. By the same token, sums spent by the petitioner in the course of the year for personal or other reasons, and which did not represent deductible expenditures, could similarly have been made in cash taken from the hotel cashbox.

With respect to the $4,000 check, petitioner claimed to have a very definite recollection that he had cashed it at the bank in the forenoon of the date on which it was drawn, that he had a tip from someone on a "specific" horse that was supposed to win, that in the afternoon of the same day he had gone to the track and bet the entire $4,000 on the "specific" horse, and that the horse had lost. Another reason advanced for remembering that the entire amount was lost in a single bet, was that the "specific" horse "should have been about a 3-to-1 shot, and so much money went in on it that it ended up as a favorite at 6 to 5, and the horse that should have been the favorite at 6 to 5 paid seven eighty or something to that effect." And yet, with a vivid memory of all the enumerated details relating to the horse and the race, petitioner not only could not remember the name of the horse, but further testified that he could not remember the name of any horse on which he had won or lost.[4]

Prior to his arrangement with Epstein, petitioner's bets, according to his testimony, had not ranged above $100 to $200. On what may have been his first bet with Epstein, however, his bet was $1,000 to $2,000, on which he won $5,000 to $6,000, but he had no recollection whatever as to the horse which won the money for him. His largest single bet, according to his memory, was $5,000, and he placed a bet

---

[4] Belatedly, he did remember the names of two horses belonging to Rice and on which he had bet, and that some of the betting on one of them possibly had been in 1949. He also professed to remember that Red Stamp was the winning horse in the race on which he had bet and lost the $4,000, and he "remembered" the name of the horse was Red Stamp because its owner was from the Argentine.

in that amount on only 2 or 3 occasions, on which he "possibly lost on one, but won on several others." Even in those circumstances, however, he claimed that he had no recollection of the horse involved, in a single instance. As a matter of fact, when he was asked who introduced him to Epstein, his answer at first was, "I don't recall who introduced me."

As to the check for $5,933.48, dated March 28, 1950, and made payable to Daniel F. Rice, it was petitioner's testimony that it was to cover money received as loans from Rice while Rice was a registered guest at the Huntington Hotel, all of which was lost on the horses at Santa Anita. In the course of his testimony concerning his relations with Rice, but not as to the check in question, he stated that Rice had last stopped at the Huntington Hotel in the winter season 1948–1949. The check, as noted, was issued in March 1950, and in view of petitioner's relations with Rice, and in the light of things Rice had done for him, as related by petitioner, it is hardly understandable that petitioner would have closed out his account with Rice & Company, in Chicago, in July 1949, receiving the entire balance of $34,158.52, $20,000 of which petitioner admits came to him and was placed in his bank account, without settling such an obligation as $5,933.48 to his benefactor. Petitioner offered no explanation as to such a delay in making good on loans which according to his testimony he had received at least a year before. The canceled check showed the endorsement first of Rice and then of Daniel F. Rice & Company, and while we are not advised as to the significance thereof, we do know from the evidence that petitioner had previously done business with Rice & Company, that the Regulated Commodity Account which had been closed in July 1949 was reopened on June 15, 1950, and that the ledger sheet covering that account shows debits under dates prior to the closing of the account in 1949 and variously explained as "Tfr To Non Reg. Grain" and "Tfr To Margin Stock Acct." Presumably petitioner had such accounts with Rice & Company at the times of the transfers, but beyond the entries mentioned there is no showing.

As supporting his claim that after drawing down $30,000 of his winnings with Epstein in May 1949 he had suffered losses with Epstein of some $22,000 to $24,000, and that the $14,158.52 shown as paid out in "currency" at the closing of his account with Rice & Company was paid to Epstein, petitioner placed in the record a printed form designed presumably for recording race horse bets. Written at the top were the initials S. R. On the first line was an entry indicating a debtor balance at December 16 of $9,595.50, on the second line a cash credit of $1,000 and on the third line a debtor balance at December 18,

1950, of $8,595.50.[5]  It was petitioner's testimony and is now his claim that the sheet in question evidenced a still unpaid balance on his losses to Epstein in 1949, after application of the $14,158.52 and a December 1950 payment of $1,000.  It was his further testimony that up to the time of the trial herein, he had never paid the balance so shown. Rice, according to petitioner, had told Epstein at the time of introduction that he would vouch for petitioner "as far as paying off my [petitioner's] losses."  Here again, petitioner, according to his testimony, failed to live up to his obligations to his benefactor Rice, even though at the time of the closing of his Regulated Commodity Account with Rice & Company in 1949, he had more than enough to have covered the accumulated losses which he claimed he then had with Epstein, which payment would have absolved Rice as well as petitioner.  Just what did become of the $14,158.52 we do not know, but we are not in doubt that petitioner has not given the true and correct accounting thereof.

There is no way, on the record before us, in which the exact amount of petitioner's winnings and losses and the net results thereof may be determined.  We do know that petitioner had net winnings in May 1949 of $30,000.  We also know, from his own testimony, that at various times in the course of the year he had further winnings in cash in his hotel safety-deposit box ranging from $5,000 to $8,000.  $20,000 of his net winnings with Epstein, whatever the ultimate disposition, found its way into petitioner's bank account, and is part of the net taxable income which respondent has determined.  Not only are we unable to accept as true petitioner's testimony as to his 1949 income, but we are convinced that he did have income in substantial sums in 1949 which he did not report and from the credible evidence of record we are unable to say that it was any less than the income respondent has determined.  Subject to adjustment for the certain items above conceded or shown not to have been income or previously reported, the respondent's determination of unreported income is sustained.

During the years herein petitioner had an arrangement with the Huntington Hotel, whereby he was to receive, in addition to his salary, 5 per cent of any increase he could bring about in the business of the catering department of the hotel over the business done for the corresponding month of the previous year.  Included in the catering department was the Ship Room, which was operated as a bar and restaurant and was a nightclub "more or less."  It is the claim of the petitioner that in promoting the catering business, including that of the Ship Room, he personally incurred entertainment expense in each

---

[5] The statement had been received by letter, airmail, postmarked Chicago, December 20, 1950.  A return address appearing on the envelope was "F. W. Walsh, 8306 Langley Ave., Chicago 19, Ill."

of the taxable years and that the expenditures therefor are deductible. For each of the years 1947, 1949, and 1950, the amount deducted on the return and the amount now claimed is $750. On the joint return for 1951, and under the heading "Business Expense & Entertainment," a deduction of $1,500 was claimed, but if we understand the petitioner's contention aright, the nature of the claim in full is the same as that which had been labeled entertainment for each of the preceding years.

The respondent acknowledges the existence of the arrangement between petitioner and the hotel, whereunder petitioner was to receive as additional compensation 5 per cent of any increase he could bring about in the business of the catering department over the business done for the corresponding month of the previous year. He does contend, however, that petitioner has failed to prove that he had entertainment expenses as claimed, and further, that the entertaining which petitioner did do outside the hotel, or more particularly the Ship Room itself, was not sufficiently related to petitioner's participation in the business of the catering department so as to make the cost an ordinary and necessary expense to him, within the meaning of the statute.

It was petitioner's testimony that he did do considerable entertaining in promotion of the business of the catering department, particularly the Ship Room, and that his efforts, including such entertaining, did bring about substantial increases in the business and that in time the business was doubled. In that connection, it is to be noted that the respondent in his determination for 1950 seemingly recognized that the petitioner did, to some extent, use his funds in behalf of the Ship Room business since he allowed the claimed deduction of $342.70, described on the return as "Travel exp. to obtain Show Hawaii for Hotel." We are accordingly persuaded by the record that under the arrangement it was contemplated that petitioner would, if need be, expend funds of his own in the promotion of the Ship Room business.

As to the expenses which were so incurred, petitioner, as in the case of his gambling operations, kept no records, and we have only his self-serving and uncorroborated testimony with respect thereto, and such testimony as we do have is broad, indefinite, and in general terms. Although making broad claims as to the extent by which the Ship Room business was increased through his activities, he made no effort to show the volume of business before the arrangement in question, or what it was from year to year thereafter, or for any of the years before us. He made no effort to support his assertions by the testimony of anyone else or from the records of the hotel, which may reasonably be assumed to have been in existence. Except for the trip to Hawaii in 1950, none of his assertions as to expenditures made in promotion of Ship Room business was directed to any particular year. As described by him, he would hear of a new restaurant and would visit

that restaurant to get ideas as to improving the operation of the Ship Room, and in the course of such trips he would have expenses. Also, according to his testimony, he would see people in bars who had bought drinks for him at the hotel, and he would buy drinks for them to promote goodwill. Aside from two restaurants in Hawaii, he at no time in the course of his testimony gave the name of any restaurant visited by him, as described above. Neither were we given any information as to the number of new restaurants which might have opened in any of the years before us, or how many were visited by him in any given year.

None of the entertainment for which the expenditures were claimed was, according to petitioner, done at the hotel. It was his testimony, however, that to some extent employees of the hotel who entertained away from the hotel in promotion of hotel business were reimbursed therefor. To what extent that may have been true with respect to petitioner's outside entertaining, we are not advised. Also, the entertaining by petitioner away from the hotel could have been related to matters other than the hotel or Ship Room business. We know that at least during 1947 and 1949 he was away from the hotel in pursuance of his gambling operations with bookmakers and at the tracks. Under such circumstances, there may well be some question as to where the entertaining in promotion of tips on horseraces ended and entertaining in behalf of his participation in the business of the catering department of the hotel began. In addition, the line of demarcation between entertaining which is related to business and that which is purely social is, to say the least, very often quite vague.

It was petitioner's further testimony that he did keep a record of his expenditures for 1953, and that for that year they were "somewheres in the neighborhood of $2,600," and were claimed as a deduction on his 1953 return, which deduction, according to his testimony, was allowed by the "District Director's Office." He did not produce the record claimed to have been kept of similar expenditures for 1953, for comparison or examination, and beyond the broad assertions and implications, there is nothing of record to indicate or show the extent to which the 1953 expenditures would be any indication of expenditures for the years before us. Further, except for his unsupported word, there is no showing that his 1953 return had been audited at the date of the trial herein, or that any examination had been made with respect to the deduction claimed.

Frankly we do not know what the truth is with respect to petitioner's expenditures in connection with his participation in the hotel's catering business. There is no way in which the amount of such expenditures may be determined of record. In our findings, we have noted,

dollarwise, the amount of the standard deduction over and above the deductions which were claimed and allowed. We are unable to say that for 1947 and 1949 petitioner's expenditures in the promotion of his participation in the business of the hotel catering business were greater than the dollar amounts indicated. By reason of petitioner's failure to show that he is entitled to a deduction in excess of the amounts allowed, his claim of error is rejected.

For the years 1950 and 1951, however, the respondent has made no allowance which covers specifically or dollarwise the expenses which petitioner did incur in his catering business activity, beyond the allowance of the $342.70 deduction covering the cost of his transportation to and from Hawaii. As with respect to 1947 and 1949, we think that the petitioner did incur some expenses in promotion of business of the hotel's Ship Room, and that the amount thereof constitutes a proper deduction or charge, for income tax purposes, against his earnings from such activities. For 1950, he has claimed expenditures of $750, while for 1951 his claim is for $1,500. There is absolutely nothing of record to support or justify a conclusion that his allowable expenses for 1951 were twice those for 1950 and the years preceding. Judging as best we can on the meager evidence which we do have, we have concluded and found that the petitioner did incur and expend for entertainment in his promotion of business for the catering department of the hotel as much as $250 in each of the years 1950 and 1951. The evidence, in our opinion, will not justify any greater amount. *Cohan* v. *Commissioner*, 39 F. 2d 540.

By six checks issued beginning with April 13, 1950, and ending with November 19, 1950, petitioner advanced $2,445 to a man by the name of A. W. Longworth. Longworth had some drawings of a dispensing machine which he wished to promote, and petitioner advanced the sums in question to him for that purpose. It was understood that petitioner would receive 20 per cent of whatever profits might be made from the machine. Under date of April 13, 1950, the date of the first check, he required Longworth to sign a paper which he, Romer, had written out in longhand, to the effect that the amounts which he might advance to Longworth should be considered as a loan. Petitioner never saw Longworth after the date on which he delivered the last check, and he professed not to know what had happened to the drawings of the machine or any promotion of a machine therefrom. On his 1950 return, however, which return was filed within 4 months of the date of the last check given to Longworth, petitioner claimed the amount of his advances as a bad debt in 1949. It was his testimony that he had, on dates not disclosed, made inquiries for Longworth at various hotels where Longworth had stayed.

From petitioner's account of his transaction with Longworth, it would appear that the advances constituted a capital investment rather than a loan, but whether they be regarded as a loan or an investment, it must be shown of record that the loan or investment became worthless in the year for which the deduction is claimed, namely, 1950, if the deduction is to be allowed. The record shows that within less than a month and a half before the end of the year for which the deduction is claimed, petitioner made a $200 advance to Longworth. There is no indication or showing that the advances, if sound when made, were any the less so prior to the end of the taxable year. For failure of proof, the respondent's disallowance of the bad deduction is sustained.

For 1947, as to Herman J. Romer, and for 1949, as to the petitioners jointly, the respondent has determined additions to tax for fraud under section 293 (b) of the 1939 Code, and from the evidence of record, we have concluded and found that the deficiencies for those years were at least in part due to fraud with intent to evade tax, and it follows that the respondent's determination must be sustained.

We are convinced from the evidence that during each of the years 1947 and 1949 petitioner Herman J. Romer engaged in gambling activities for profit and that in each year he realized substantial gains therefrom. At no time during either of the years did he record or undertake to keep a record of his gambling transactions or the results thereof. We are satisfied that his course of conduct with respect to an accounting for and the reporting of the gains which he might have, and which in fact he did have, was indulged in with an intent to evade such portion of his income tax as was attributable to his gains from such gambling activities.

We are also convinced from the evidence, and have found as a fact that his Federal income tax returns for those years were false and fraudulent, and so made with an intent to evade tax. For both 1947 and 1949,[6] the pleadings raise the question of statute of limitations. As to the year 1949 and for the year 1947 as to Herman J. Romer, our conclusion and finding that his returns as filed were false and fraudulent with intent to evade tax disposes of the plea of statute of limitations, and the decision thereon is for the respondent.

As to petitioner Joyce M. Romer, who filed a separate return for 1947, the respondent now concedes that her return for that year was not false and fraudulent with intent to evade tax. It is his position, however, that in her return for that year she omitted from reported gross income an amount which was in excess of 25 per cent of the gross

---

[6] There is respectable basis of record for concluding that petitioner has abandoned or conceded this issue as it relates to 1949. It was argued as an open issue by the respondent, however, and to obviate any question with respect thereto decision thereon has been stated.

income reported, and that under section 275 (c) of the 1939 Code, the period of assessment is 5 years instead of 3, and since within such 5-year period she consented to an extension of the period of assessment to a date beyond the date the notice of deficiency was mailed, the statute of limitations has not run.

For the year 1947, the facts show that the petitioners filed individual returns, in which they reported their income on a community property basis, and we have found from the evidence that such income was understated by more than 25 per cent. The facts show that Joyce M. Romer filed her 1947 return on January 15, 1948, and that the consents in question were executed on February 11, 1953, which was more than 5 years after the date on which her 1947 return was filed. By section 275 (f), however, it is provided that for the purposes of the limitation upon assessment and collection of the tax, "a return filed before the last day prescribed by law for the filing thereof shall be considered as filed on such last day." The last day for filing her 1947 return was March 15, 1948. It thus appears that the consent extending the period for assessment and collection of her 1947 income tax to June 30, 1954, was executed less than 5 years from the filing of her return, as prescribed by section 275 (f), and for the purposes here constituted an effective waiver. Her claim that the assessment and collection of the 1947 deficiency determined against her is barred by the statute of limitations is accordingly rejected.

While the record does not show any facts as to the filing, or failure to file, declarations of estimated tax for 1947 and 1949, aside from the fact of respondent's determination of additions to tax under section 294 (d) (1) (A) and (d) (2), the petitioners make no claim that any such declarations of tax were filed, but instead, ask for a finding for each of the years that "there was no failure to file a declaration of estimated tax which was not due to reasonable cause." In support thereof, their argument, on brief, is that they "had taxes withheld currently which were within a few hundred dollars of the reported tax," and they "were convinced that no declaration of estimated tax was required when their taxes were being currently withheld."

Obviously, the petitioners do not claim that declarations of estimated tax for 1947 and 1949 were filed, and at its best the argument advanced amounts to a claim that their failure to file the required declarations was due to ignorance of the law, and accordingly was due to reasonable cause. That argument is without merit. *Andre Picard*, 28 T. C. 955. The respondent's determinations of additions to tax pursuant to the provisions of section 294 (d) (1) (A) and (d) (2) are sustained. See *Anthony Delsanter*, 28 T. C. 845, and other cases cited therein.

*Decisions will be entered under Rule 50.*