JESSE ULLMAN REAVES, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 58018. Filed December 31, 1958.

*Vincent F. Kilborn, Esq.,* and *Michael J. Salmon, Esq.,* for the petitioner.

*Lester R. Uretz, Esq.,* for the respondent.

698

704

710

## OPINION.

TURNER, *Judge:* As to all years, the petitioner has pleaded the statute of limitations, and as to all years, except 1944, it is agreed that the statute has run, unless the returns filed by the petitioner for the said years were false and fraudulent with intent to evade tax. For 1944, the petitioner did file an unsigned income tax return form on which income and deduction items had been entered and the tax had been computed, but no return complete with his signature has ever been filed for such year. On comparable facts, the Supreme Court, in *Lucas* v. *Pilliod Lumber Co.*, 281 U. S. 245, held that the filing of an unsigned return form, even though it did contain various statements in respect of gross income, deductions, credits, etc., was not the filing of an income tax return within the meaning of the statute and did not start the running of the statute of limitations against the respondent. The *Pilliod Lumber Co.* case is directly in point, and is controlling here. See also *Roy Dixon*, 28 T. C. 338, and *Theodore R. Plunkett*, 41 B. T. A. 700, affd. 118 F. 2d 644.

For the remaining years 1942, 1943, 1945, 1946, and 1947, the record convincingly shows that petitioner omitted from his returns as filed a substantial portion of his income for each such year, and on the evidence, we are not in doubt that such omission was with intent to evade tax and that the return filed for each such year was false and fraudulent with intent to evade tax.

Theoretically, the McCaskey accounting forms used by petitioner, if properly kept, would have reflected the services rendered by him for each and every patient, the charges therefor, and the collections made, and the aggregate of such collections for each day of the year,

by months, would have been reflected on the monthly summary record sheets, the total receipts from his medical practice for the year being the aggregate of the monthly totals. Violet Marshall, petitioner's nurse-secretary, purported to keep and maintain the individual patient cards, but in the case of payments made by patients directly to petitioner, she would either enter the amounts related to her by petitioner or leave the recording of the payments on the patients cards to petitioner. Admittedly, however, McCaskey cards were not made out for certain patients examined or treated by petitioner, and no permanent record was ever made and kept to reflect the payment made by them. Where the payments by these patients were made to Violet Marshall, she would enter such payments on a prescription blank used as a memorandum sheet for the day, along with the payments received by her from patients for whom McCaskey cards were maintained. After lunch each day, she would report her receipts to petitioner, and purportedly he would enter the total of the payments she reported, plus the total of the payments he had received, on the sheet of his desk calendar for the said day to reflect the total receipts from his medical practice for the forenoon of such day. The same procedure would be followed with respect to the afternoon business, and the total of amounts he had entered as the morning receipts and as the afternoon receipts was supposed to represent the total receipts for the day.

Thereafter, and, according to petitioner, within a few days, he purported to transfer the total figures for each day as reflected by his desk calendar to the proper line and sheet of McCaskey monthly summary record sheets. The only disclosed use of the sheets was that in making his returns, the collections as shown by the sheets for the year in question represented the amount he reported on his return as his total receipts for the year. In the meantime, Violet Marshall had destroyed her prescription blank memorandum sheets, and petitioner likewise discarded or destroyed his desk calendar from which the figures appearing on the monthly summary sheets purportedly had been taken. In tabulating the amounts reported as his total receipts on his income tax returns, no effort was ever made to check or verify the figures as taken from the above summary record sheets by reference to the McCaskey cards or any other records.

However the petitioner may have arrived at the amounts entered as his daily receipts on the monthly summary sheets and reported by him in his returns as the total receipts from his medical practice, we are satisfied that they were not authentic and represented substantial understatements of income. For instance, the duplication of entries on the summary sheet for March 1944 on the sheet for April is so noticeable as to leave no doubt that the entries on one or the other of the sheets, or both, were purely artificial, whatever the correct figures

may have been. We also know that from time to time, throughout the years herein, the petitioner received a payment from a single patient greatly in excess of the amount shown for the same day on his monthly summary sheet as the total receipts from all of his patients for that day. It is thus apparent that whatever Violet Marshall may have reported to petitioner as the payments she had received on any such day, the amount ultimately entered by petitioner on the summary record sheets as his total receipts for the day, and carried therefrom into his income tax returns, was substantially less than the amount actually received.

The record also shows that in 1950 or 1951, in connection with the preparation of petitioner's defense against criminal charges, his counsel caused an accountant to make a check of the McCaskey cards in petitioner's office showing payments received for the years 1945, 1946, and 1947, and the amounts shown by this accountant's report indicated that the recorded receipts on the McCaskey cards and the "Ledger Sheets (Hospital)" for the year 1945 were $2,843.27 more than the total receipts reported by petitioner on his return for that year; that for 1946, the records disclosed receipts $1,475.59 in excess of the total receipts reported; and for 1947, $2,201.66 greater than the total receipts reported. And even if we accept as true that all of the McCaskey cards for the years herein were available at the time the above check was made, and even if it be assumed that petitioner had recorded in full the collections he personally received from patients for whom McCaskey cards were made, an assumption we are unable to make, the proof shows that petitioner had patients for whom McCaskey cards were not prepared and who were not "Hospital" patients, and his receipts from those patients would obviously be in addition to the receipts shown by the records which were so checked in 1950 or 1951.

It is thus apparent that there are not now and never have been any records from which the receipts from petitioner's medical practice could be verified or correctly determined, and petitioner alone was in position to know the extent to which such receipts were understated on his returns, and he alone was responsible for such understatements. Violet Marshall regularly accounted for and reported her collections to petitioner. But except for what petitioner told her, she knew nothing of his collections, and though she did assume that as entered by petitioner the figures on his desk calendar correctly reflected the receipts from his medical practice, she had nothing to do with the adding or entry of the figures on the desk calendar, and in fact did not understand them. As for the summary sheets, from which the amounts reported on the returns were taken, it does not appear that she or anyone other than petitioner, who made them, knew of their existence. Such being the case, we are asked to accept as true the testimony of the petitioner, to the effect that the entries made twice daily on his desk

calendar were bona fide intended and thought to be a correct recording of the receipts from his medical practice, and that they were honestly transferred to the monthly summary record sheets, and thence to his returns.

For the years 1943, 1944, and 1945, however, petitioner not only maintained the monthly summary sheets used in making his returns, but, privately, also kept a second set of monthly summary records showing as his receipts from medical practice amounts more than twice the amounts reported as such on his returns, and as disclosed on the low summary sheets. With respect to this second set of records, we are asked to believe petitioner's testimony to the effect that they do not mean what they say; that they were set up and maintained for the purpose of keeping a record of the cash taken, from time to time, from the safe-deposit box, but in making such records the cash in question was scrambled, so to speak, with actual receipts from medical practice, so that the resulting totals would appear in their entirety to represent receipts from medical practice. It was petitioner's testimony that he made his entries as he did to prevent any employee from learning of his personal affairs and passing such information on to others, in that the two sets of monthly summary records, the high and the low, would "confuse them." Having examined the said records, we can readily agree that they would be confusing to anyone who saw and undertook to reconcile them, but we are equally certain that they would incite, not discourage, gossip, and we are also certain that petitioner's real reason for setting up the two sets of records and in the form he did was not the reason given.

With respect to the years 1945, 1946, and 1947, we are asked to disregard petitioner's plea of guilty in 1953 to the charge that he unlawfully and knowingly attempted to defeat and evade a large part of his income taxes for those years by filing false and fraudulent returns, and to believe his current testimony to the effect that he was not guilty of the said charges of fraud, but entered the plea of guilty because of the continued pressure from the attorneys who were representing him and because of their assurances that his punishment, in the end, would amount to no more than a $2,500 fine.

It is unnecessary, we think, to undertake a discussion of all the conflicts between petitioner's present testimony and his prior representations, some under oath, to the revenue agents and other Government representatives, or to review various of his recitations and explanations, which were to us vague or equivocal, and others which we have found incredible. We listened to petitioner's testimony attentively and carefully. We observed his demeanor on the witness stand. We have since examined and reexamined the transcript of his testimony, the testimony of the other witnesses, and the documentary evidence of record, and we are convinced that his current testimony as to the

receipt, the recording, and his reporting of his income for the years herein does not represent the truth.

We are satisfied that Violet Marshall, from day to day, conscientiously reported to petitioner the fees received by her from patients in payment for services which petitioner had rendered to them. We are also satisfied that petitioner did regularly make entries, twice each day, on his desk calendar, which purported to represent the total of his receipts for the day. But whether they did or did not correctly reflect his medical income, is of no particular importance, since the amounts reported on his returns as his receipts from medical practice were not taken from the desk calendar, but from the so-called low summary sheets, and, as heretofore noted, these sheets were not authentic and the amounts shown thereon as his receipts from medical practice were substantially less than his actual receipts for each and every year. The omissions in recording and reporting his income were accordingly the acts of the petitioner himself, and we are satisfied that they were deliberate and knowing. In short, we are convinced that for all of the years herein, petitioner set up and maintained false records with respect to his income from medical practice, that he did so for the purpose of using them in the preparation of his income tax returns, and based on the said records and with intent to evade tax, he fraudulently omitted substantial portions of his income from his returns for the said years. We are satisfied that he pleaded guilty to the criminal charges for the years 1945, 1946, and 1947 because he was guilty and thought that by so pleading his punishment would be lighter. In our opinion, the evidence clearly and convincingly shows that for each of the years 1942, 1943, 1945, 1946, and 1947, petitioner's income tax return was false and fraudulent with intent to evade tax,[16] and we so hold. As a consequence, there is no limitation on the time within which the respondent may assess and collect any deficiencies which may be due and owing for the said years. Sec. 276 (a), I. R. C. 1939.

Where a taxpayer has failed to keep adequate books of account as required by the statute and the regulations thereunder, the Commissioner must determine or verify the income from the records or sources that are available, and his determination of income by analysis of bank deposits and expenditures has been approved in numerous cases. *Goe* v. *Commissioner*, 198 F. 2d 851, certiorari denied 344 U. S. 897; *Halle* v. *Commissioner*, 175 F. 2d 500; *Hague Estate* v. *Commissioner*, 132 F. 2d 775, certiorari denied 318 U. S. 787, affirming 45 B. T. A. 104; *Hoefle* v. *Commissioner*, 114 F. 2d 713; *Mauch* v. *Commissioner*, 113 F. 2d 555; *Herman J. Romer*, 28 T. C. 1228; and *Joseph Calafato*, 42 B. T. A. 881. See also *Carmack* v. *Commissioner*, 183 F. 2d 1. It is,

---

[16] In so concluding, we have given no weight to any failure by petitioner to prove error in respondent's deficiency determinations.

of course, true that the existence of bank deposits, even though not explained or accounted for in a satisfactory manner, does not of itself show that the sums deposited were or were not income. But where the Commissioner, in the absence of adequate records, has determined that they were, the taxpayer has the burden of showing that the determination was wrong.

The facts show that for each of the taxable years the deposits to the petitioner's checking account with the First National Bank, the account in which deposits of his medical income were regularly made, were substantially in excess of his reported income, even after allowance for transfers from other bank accounts, deposits of loan proceeds, and the like. It was petitioner's own testimony that most, if not all, of his receipts from nonprofessional sources, such as proceeds from the sale of real estate, interest, rents, and dividends, were deposited in his savings account with the American National Bank. According to the facts, however, the deposits in the checking account at the First National Bank are not accounted for or explained even to the extent of the reported income, since for each of the taxable years petitioner expended substantial portions of his income without deposit in any of his bank accounts, and taking into account only the expenditures admittedly so made, such expenditures included amounts paid out for such items as oil and gas, office uniforms, and petty office expenses; petitioner's personal out-of-pocket expenditures; most, if not all, of the $50 per week, or $2,600 a year, paid to Violet Marshall; and at least $25 per week, or $1,300 a year, admittedly given by petitioner to his wife for household and other personal expenses.

In explanation of the deposits, it was the testimony of the petitioner that he had been accumulating currency in his safe-deposit box for an indefinite number of years prior to January 1, 1942; that at and after World War I, he had made substantial purchases of Liberty Loan bonds; that in addition to other purchases of such bonds, he purchased in one block bonds of the face amount of $50,000, borrowing $35,000 from the First National Bank to make the purchase; that all of the Liberty Loan bonds had been redeemed prior to 1942 and the proceeds therefrom placed in the box, accounting for the major portion of the currency accumulated therein; that though he had never counted the money and had no record of the amount, he "must" have had in excess of $100,000 in the box at January 1, 1942; and that during the taxable years, and pursuant to a United States bond-purchasing program started during World War II, the currency had been taken from the box, from time to time, by his wife and handed over to him and the major portion thereof had been deposited in his bank account and used in his bond-purchasing program.

To the extent that currency accumulated prior to 1942 did account for funds included in the said deposits and the respondent in his

deficiency determinations did not make allowance therefor, his determinations were in error.

Although we are unable to put any credence in any self-serving testimony of petitioner, we are of the opinion, based on the testimony of his wife, that he did have some substantial amount of currency in his safe-deposit box at January 1, 1942, and we have so found. We are also of the view that his wife was telling the truth when she testified that she withdrew sums of money from the box periodically for the purpose of buying United States bonds and that by the end of 1947 the money in the box had been exhausted for such use and in payment of some amounts on the St. Anthony Street property.

The evidence shows, and we have found, that following World War I petitioner did acquire some quantity of Liberty Loan bonds of various issues, and it may well be that most, if not all, of the currency in the lockbox at January 1, 1942, was from the redemption of such bonds. Petitioner disavows having kept any record of the bonds purchased and, aside from broad generalities, did not profess to remember the extent thereof or the amounts received in redemption. In his signed statement to the Attorney General, in connection with the criminal charges, he stated that in the fall of 1920, and at the instigation of a vice president of the First National Bank, a loan of $35,000, evidenced by his note in that amount, was procured and used in the purchase of a single block of $50,000 face value of such bonds, and that these were in addition to some $25,000 to $30,000 worth of bonds already acquired. He also stated that the bonds so owned and thereafter redeemed amounted to at least $65,000 face value. As to the execution of a note for $35,000 for the purpose stated, there is some corroboration in his wife's testimony. No one was called from the bank to produce records or give testimony with respect to the alleged loan, however, and it was petitioner's statement in the course of his testimony that the bank had no record thereof. And though petitioner did retain and produce two canceled notes made in 1920, one for $1,400 and another for $6,100, which do appear to have been given in connection with the purchase of Liberty Loan bonds, he professed to having no recollection of the fate of the said $35,000 note.

In contrast with the above, however, the evidence rather conclusively shows that at October 5, 1921, approximately 1 year later, the total face value of all Liberty Loan bonds then belonging to petitioner was $24,800, which with certain foreign and domestic bonds, some few shares of stock, small amounts of savings stamps, and two mortgages brought his holdings of securities as of that date to $46,500. Upon production at the trial herein of this list of securities as at October 5, 1921, petitioner professed to remember that the claimed $35,000 loan and the purchase of bonds therewith was subsequent to October 5, 1921, and may have been in 1923. It was in May of 1923, however,

that he was regarding a mortgage on Mobile real estate as a more attractive investment than Liberty Loan bonds, since on May 15 of that year he sold $15,000 face value of the bonds he then owned to procure funds for buying such a mortgage.

Beyond the recollection that the making of the payments on the claimed $35,000 loan was quite difficult but were all made as soon as possible, petitioner's records and memory of payment were no better than with respect to the date of the loan itself. It is obvious, we think, that his medical practice would have had to have been the source of most of the funds for making the payments, and we do not understand petitioner to contend otherwise.[17] And certainly the amounts shown as petitioner's income tax payments supply no basis for the conclusion that in any of the indicated years any very substantial overplus of such income could have been available for that purpose, a fact which becomes even more graphic when it is noted that on some undisclosed date in that period he was able to buy 4 $1,000 City of Tuscumbia Street Improvement bonds and at a cost of $5,000 to acquire the property on Government Street for his new home and by February of 1927 was able to complete the new home at a cost of $25,000 for construction and $2,000 for the architect's fee. And not without significance, we think, is the fact petitioner was from September 14, 1920, to February 1, 1922, in completing payment of the above $6,100 note.

Thereafter, in March of 1930, with money from some source, whether from Liberty Loan bonds or otherwise, he was able to pay $11,000 for a mortgage, secured by Mobile property. Also, even though he sustained losses, the extent of which he did not remember, during the depression, and after 1928 and through 1938, except possibly for 1937, in respect of which there is no record, his medical receipts and other taxable income were purportedly such as to require the payment of income tax for only 4 years and in the aggregate amount of only $40.47, he was able to buy, with funds from some source, 5 $1,000 County of Mobile Road and Bridge bonds, a parcel of real estate on Wellsworth Street in Toulminville, another in Crichton, and two in Mobile. We also note that for 1939, 1940, and 1941, his medical income and other taxable income purportedly was such as to require payments of income tax of only $14.36 for 1939 and $59.25 for 1940, although he did pay $376.73 for 1941.

The facts show that various securities and other assets acquired by petitioner, beginning back in the 1920's, were still on hand at January 1, 1942, and could not have been the source of any of the currency in the box. The facts also show that losses were sustained on certain

---

[17] It was petitioner's testimony that the interest from the bonds themselves, except for one-eighth of 1 per cent, was committed to the payment of interest on the purchase loans, and except possibly as the loans became paid up, the interest on the bonds being purchased would not be available to petitioner.

investments, and it was petitioner's testimony that though he did not remember the extent thereof, he had sustained investment losses during the depression. Excluding the above items and taking into account the Liberty Loan bonds which we know from the evidence he did acquire, the possibility that he may have had some other such bonds not definitely shown, and other possible or probable sources of currency as indicated by the evidence and as set out in our Findings of Fact, we are persuaded that petitioner did have in his lockbox as of January 1, 1942, as much as $20,000 in currency, and we have so found. When that is said, we have gone as far as the evidence, in our opinion, will justify. *Cohan* v. *Commissioner*, 39 F. 2d 540. Also, we are satisfied that this accumulated sum was taken from the box, from time to time, and over the years herein fairly evenly used in the purchase of United States bonds, most likely Series E bonds, and effect should be given thereto in the recomputation of the deficiencies herein.

Although directed to the fraud issue, and not to the correctness of the deficiency determinations, the petitioner, on brief, does argue that the amounts of deductible expenditures determined by the respondent as having been made from undeposited receipts were excessive. From the deficiency notice, it appears that the respondent, in arriving at net income, did not disallow and add back to income any part of the amounts petitioner had claimed as deductions in his returns. After examination of the Greenwood books and the canceled checks, he did find that the deductible items which had been paid by check were, in the aggregate, substantially less than the total deductions claimed, and in his determination he allowed the claimed deductions to stand, but treated the difference between the two as amounts paid with undeposited receipts, in arriving at total unreported receipts. It is petitioner's contention that among the deductions claimed on the returns were various nondeductible items, such as living expenses and capital expenditures, which were paid by check, and as a consequence, that if respondent had disallowed and eliminated those deductions in arriving at the deductions paid from undeposited receipts, the amount of the deductions determined to have been so paid from undeposited receipts would have been considerably smaller and the total of both the undeposited receipts and the unreported income would have been smaller than respondent has determined. Granted that such would have been the case, this does not establish error in respondent's determination of net income and the deficiencies. The actual disallowance of and elimination of capital items and living expenses from the deductions claimed would have required, by the method of computation followed by respondent, the adding back thereof to income in arriving at net income. Since they were not so disallowed and added back, they still absorb, in arriving at net income, the amounts of which petitioner complains. In this respect, petitioner has not shown error in the

deficiencies determined, and actually, it is not clear from his brief that he so claims.

Although there is no expressed concession of the depreciation issue, no argument is advanced on brief, and no evidence showing error in respondent's determination has been called to our attention. The respondent's determination is sustained.

As to the Gorgas Street property, the facts show that in 1934, when petitioner agreed to accept it on account from one of his patients, he had the property deeded to his wife, and when it was sold in 1944 his wife was made payee on the note given in payment of the purchase price. It is true that petitioner, at the trial herein, did make some reference to the property as if it were his property and proof as to ownership might have been more definite, but we are persuaded by the evidence which we do have that his wife, not the petitioner, was the owner of the property, and the gain realized on the sale was her income. We so hold.

Our findings of fact supply adequate basis for making adjustments for items such as the two Alabama By-Products Corporation bonds which were redeemed, one in 1945 and the other in 1947, and discussion thereof should be unnecessary.

Most of what we have said above as to fraud in making the returns is applicable with respect to the additions to tax for fraud. The evidence convincingly shows that part of the deficiency for each of the taxable years was due to fraud with intent to evade tax, and we have so found. Sec. 293 (b), I. R. C. 1939.

Since, as discussed above, the filing of the unsigned return form for 1944, even though it did reflect items of income and deductions, was not the filing of a return within the meaning of the statute and the petitioner has failed to show that his failure to file a proper return for that year was due to reasonable cause, and not to willful neglect, respondent's determination of an addition to tax for that year, pursuant to section 291 (a) of the 1939 Code, is approved.

*Decision will be entered under Rule 50.*