Estate of Morton Alpirn, Deceased, David P. Feder and A. B. Gendler, Administrators v. Commissioner.
Estate of Alpirn v. Commissioner
Docket No. 46413.
United States Tax Court
T.C. Memo 1959-60; 1959 Tax Ct. Memo LEXIS 182; 18 T.C.M. (CCH) 314; T.C.M. (RIA) 59060; March 31, 1959
*182 Respondent determined deficiencies in income tax and additions thereto for fraud for the years 1946 to 1951, inclusive, against Alpirn. Although placed in issue by the pleadings, no part of the deficiency in income tax was contested at the trial except insofar as certain salary and expense payments were disallowed. Held, that payments to Alpirn's father during each of the years 1946 to 1951, inclusive, represent "reasonable compensation for personal services actually rendered" but that payments to Nell Ross during 1951 are not deductible because of a failure of proof by petitioner. Held, further, that respondent has proved by clear and convincing evidence that some part of the deficiency for the year 1951 is due to fraud with intent to evade tax but that respondent has failed in his proof on the fraud issue for the years 1946 to 1950, inclusive. Jack W. Marer, Esq., and Leo Eisenstatt, Esq., for the petitioners. Ivan L. Onnen, Esq., and Joseph D. Skinner, Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion The respondent has determined deficiencies in income tax and additions thereto under section 293(b), Internal Revenue Code of 1939, *183 [1] as follows: Additions
to the Tax
Year
Deficiency
Sec. 293(b)
1946
$ 38,309.97
$ 19,154.99
1947
17,808.30
8,904.15
1948
23,006.00
11,503.00
1949
13,533.32
6,883.16
1950
18,407.64
9,203.82
1951
305,816.30
152,908.15
The deficiencies are due to a number of adjustments to the petitioner's income. For example, the deficiency for 1951, by far the largest of the deficiencies determined, is due to three adjustments made by the Commissioner to the income as reported by Morton Alpirn on his return for that year. These adjustments are: Unallowable deductions and additional income:
(k) Business income
$281,918.27
(l) Capital gains
10,599.50
(m) Inventory at December 31, 1951
68,650.03 These adjustments are explained in the deficiency notice as follows: "(k) Based on an analysis of your net worth at the beginning and at the end of the taxable year and on an analysis of your withdrawals and disbursements which are not deductible under the provisions of the Internal Revenue Code, it is determined that your business income is $286,218.27 *184 instead of $4,300.00 reported on your return. "(l) It is determined that you realized a net short term capital gain of $10,599.50 during the taxable year which was not reported on your return. "(m) It is found that your inventory of merchandise at December 31, 1951, is $101,150.03, whereas the inventory shown on the return filed by the Western Smelting and Refining Company, an alleged corporation whose existence for purposes of the income tax is not recognized, is only $32,500.00. The difference of $68,650.03 is added to your reported income." The entire deficiencies have been placed in issue by the pleadings but the only questions now remaining regarding petitioner's income are whether certain salary and expense payments by petitioner are deductible. In addition, the principal question involved is whether any part of the deficiency for each of the years is due to fraud with intent to evade tax. Findings of Fact Some of the facts have been stipulated; they are incorporated herein by this reference. General During the taxable years involved Morton Alpirn, hereinafter referred to as Alpirn or petitioner, was an unmarried individual with residence at Omaha, Nebraska. *185 He filed individual income tax returns for each of the years 1946, 1947, 1948, 1949, 1950, and 1951 with the then collector of internal revenue for the district of Nebraska. He died on February 9, 1955. David P. Feder and A. B. Gendler are the duly appointed administrators of his estate. Alpirn's Estate is the petitioner herein. Abraham B. Alpirn, hereinafter referred to as Abraham, Alpirn's father, began in the scrap metal business around 1892. The business was later incorporated under the name of Western Smelting & Refining Co., hereinafter referred to as Western, by Abraham and two others and commenced business under that name on June 1, 1915. Alpirn became connected with Western in 1921. Western was dissolved in May 1933 by the Secretary of State of the State of Nebraska, pursuant to the laws of the State of Nebraska, for nonpayment of State of Nebraska occupation taxes and no action was taken at any time thereafter to renew or revive the corporate charter pursuant to the laws of the State of Nebraska. The corporate existence of Western was terminated at some unspecified time prior to January 1, 1946, but the business continued to operate under the same name. Around 1941, Abraham *186 became less active in the business and Alpirn took over as manager. During the years 1946 to 1951, Alpirn operated Western as a sole proprietorship. Western's business during these years consisted of buying and selling metals, principally steel and aluminum. These metals were new and not scrap. Western's office was at 7th and Douglas Streets in Omaha. Alpirn was assisted during the years 1946 to 1951 by Abraham and Feder, Alpirn's brother-in-law. In addition, a woman was employed to do the stenographic work for Western but she performed her duties in her home. Despite the fact that Alpirn had employees he did most of the work himself. He did practically all of the buying and all of the selling. Feder's principal duty was taking care of the telephone calls at the office taking messages for Alpirn. He neither bought nor sold metals; he did not confirm purchase or sale orders; he did not prepare bank deposits or write business checks. He did occasionally make deposits for Alpirn. Western did not maintain a set of books to record and reflect its transactions. For each of the years involved Western filed a corporate return which showed the following (.00 omitted): 1946
1947
1948
1949
1950
1951
Gross Sales
$ 961,272
$337,883
$481,711
$251,387
$860,043
$948,418
Cost of goods sold
Inventory 1/1
$ 55,147
$ 78,042
$ 81,500
$ 80,200
$ 69,340
$110,900
Purchases
963,068
307,250
426,216
201,036
782,450
654,853
Salaries & Wages
13,884
11,777
15,991
15,894
16,210
16,270
Other Costs
4,318
3,318
8,216
18,399
71,219
144,450
Total
$1,036,418
$400,388
$531,924
$315,529
$939,219
$926,474
Inventory 12/31
78,042
81,500
80,200
69,340
110,900
32,500
Total Cost of Goods Sold
$ 958,375
$318,888
$451,724
$246,189
$828,319
$893,974
Gross Profit
$ 2,896
$ 18,994
$ 29,986
$ 5,198
$ 31,723
$ 54,444
Deductions
6,246
9,564
14,750
11,494
15,850
12,905
Net Profit or (Loss)
$ (3,350)
$ 9,430
$ 15,236
$ (6,296)
$ 15,973 *
$ 41,538
*187 The corporate returns of Western showed "Compensation of Officers" (included in cost of goods sold - salaries and wages) as follows (.00 omitted): 1946
1947
1948
1949
1950
1951
A. B. Alpirn
$2,120
$2,450
$4,200
$3,975
$4,500
$4,500
Morton Alpirn
3,025
3,650
4,825
4,225
4,360
4,300
David Feder
7,500
4,400
5,885
6,382
6,000
6,000
Alpirn, for the years 1946 to 1951, returned as his only income the amounts shown on the Western returns as compensation to him. Respondent, in his notice of deficiency, added income as follows: Adjusted Gross Income
Year
Reported
Added
Corrected
1946
$3,025.00
$ 66,116.68
$ 69,141.68
1947
3,650.00
36,586.16
40,236.16
1948
4,825.00
46,739.34
51,564.34
1949
4,225.00
32,185.21
36,410.21
1950
4,360.00
38,762.91
43,122.91
1951
4,300.00
361,167.80
365,467.80
For the years 1946 to 1950, the amounts added consist solely of "business income." For the year 1951, the amount added consists of "business income" of $281,918.27 ($286,218.27 less $4,300 reported), short-term capital gains of $10,599.50 and inventory *188 at December 31, 1951, of $68,650.03 ($101,150.03 minus $32,500). For the years 1946 to 1948 the "business income" adjustment is explained as follows: "It is determined that the net income of the business known as the Western Smelting and Refining Company, an alleged corporation whose existence for the purposes of the income tax is not recognized, is [amount], and that such amount is taxable to you in lieu of [amount] reported on your return." For the years 1949 to 1951, the "business income" adjustment is explained as follows: "Based on an analysis of your net worth at the beginning and at the end of the taxable year and on an analysis of your withdrawals and disbursements which are not deductible under the provisions of the Internal Revenue Code, it is determined that your business income is [amount] instead of [amount] reported on your return." The inventory adjustment for 1951 is described as that of Western. It is agreed that the income and losses reported on Western's returns for the years 1946 to 1951 shall be treated as the business income and losses of Alpirn for the same years, respectively, in determining the taxable income of Alpirn for such years. *189 Deductions The deficiency notice does not reflect the computation of the "business income" which was added to Alpirn's income. However, it is agreed that in arriving at "business income" the respondent did not allow deductions for the amounts shown on Western's returns as compensation for Abraham. Nor did the respondent allow a deduction of $3,559.46 for the year 1951 which represents payments to Nell Ross. (This latter amount is not reflected separately on Western's return but is apparently included in a composite figure.) [2]
Abraham had long and extensive experience in the metals business. During the years involved he acted as an advisor to Alpirn. On occasion he purchased metals. *190 He occupied a desk in Western's office and was there daily. For the years 1947 to 1951, Alpirn prepared returns for Abraham which reflected the "compensation" for Abraham as shown on the Western returns. This was the only item of income on the returns. The returns also showed a tax due for the years 1947 to 1950 which was remitted with the returns. Western's bank account showed charges in amounts equal to the tax due on Abraham's returns shortly after the returns were filed. The following schedule shows the information on Abraham's returns and dates of the bank charges: Tax
Western's
Due and
Charge on
Year
Date Filed
Income
Remitted
Bank Account
1947
March 15, 1948
$2,450
$231.00 [1]
March 23, 1948
1948
March 14, 1949
4,200
233.00 [1]
March 17, 1949
1949
March 15, 1950
3,975
195.00 [1]
March 21, 1950
1950
March 15, 1951
4,500
19.80 [2]
March 24, 1951
1951
March 18, 1952
4,500
0 [2]
Abraham died in 1954 at the age of 87. The amounts of $2,120, $2,450, $4,200, $3,975, $4,500, and $4,500 for the years 1946, 1947, 1948, 1949, 1950, and 1951, respectively, paid to Abraham *191 constitute "a reasonable allowance for salary or other compensation for personal services actually rendered" and were ordinary and necessary business expenses of Alpirn. The amount of $3,559.46 paid to Nell Ross in 1951 did not constitute an ordinary and necessary business expense of Alpirn and was not "reasonable compensation for personal services actually rendered" by her to Alpirn. Fraud The following findings are in addition to the other findings which may relate in one way or another to fraud: Sales. The following schedule reflects the total deposits in the bank accounts of Western, the portion of those deposits which the respondent concedes does not represent the proceeds of sales, the remaining deposits, the amounts of sales reported on the returns of Western, and the differences between the last two amounts (.00 omitted): 1946
1947
1948
1949
1950
1951
Deposits: First Nat. Bank
$1,115,154
$362,589
$ 65,260
Livestock Nat. Bank
644,045
$342,038
$1,639,643
$960,978
Total Deposits
$1,115,154
$362,589
$709,306
$342,038
$1,639,643
$960,978
Less amounts concededly not income: Proceeds of loans
(47,495)
(200,292)
(57,000)
(419,000)
Customers advances returned
(39,038)
Advances to suppliers returned
(169,234)
Duplicate deposit
(12,322)
Re-credit of erroneous charges
(237)
Proceeds of brokerage account of
Alpirn
(15,975)
Deposits possibly representing income
$1,028,619
$362,589
$509,014
$269,062
$1,051,408
$948,418
Sales reported
961,272
337,883
481,711
251,387
860,043
948,418
Balance of deposits unaccounted for
$ 67,347
$ 24,706
$ 27,302
$ 17,675
$ 191,365
*192 The following schedule reflects certain amounts received by Alpirn as payment for goods sold by him, the purchaser of these goods, and the dates on which the check (or other instrument) in payment therefor was cashed or negotiated by Alpirn: Date of
Date Cashed
Payment
Payor
Amount
or Negotiated
10/26/48
Western Electric Co.
$ 5,557.39
5/17/49
5/23/49
Allison Bedford Foundry
2,885.96
5/24/49
2/17/49
C. H. Berglund Co. (Cashier's check)
1,000.00
3/23/49
4/25/49
Bendix Aviation Corp.
269.00
5/ 3/49
5/20/49
Bendix Aviation Corp.
265.20
5/24/49
6/22/49
Bendix Aviation Corp.
413.96
6/27/49
$ 4,834.12
12/12/51
Zenith Optical Co. (drafts)
$ 922.48
4/ 9/52
12/13/51
Zenith Optical Co. (drafts)
4,626.83
4/ 9/52
12/21/51
Zenith Optical Co. (drafts)
5,369.45
4/ 9/52
5/ 8/51
Acrometal Products, Inc. (drafts)
2,146.08
5/29/51
Acrometal Products, Inc. (drafts)
1,314.90
7/ 6/51
Moore & Eastwood Co. (draft)
2,406.64
7/16/51
4/ 2/51
Schwitzer-Cummins Co. (draft)
7,892.85
7/16/51
7/20/51
Zimmer Industries, Inc.
1,407.24
5/10/51
Engineering & Research Corp.
15,279.68
7/11/51
5/ 1/51
Light Metals Corp. (draft)
2,651.00
5/24/51
5/ 9/51
Light Metals Corp. (Cashier's check)
1,370.20
5/24/51
4/27/51
Angell Mfg. Co. (bank M.O.)
8,943.00
5/29/51
4/ 5/51
Int. Harvester Co. (draft)
18,287.50
7/26/51
5/ 2/51
Int. Harvester Co. (draft)
5,052.85
6/ 6/51
5/ 8/51
Int. Harvester Co. (draft)
18,007.55
9/20/51
5/31/51
Hobart Mfg. Co.
9,520.50
6/ 6/51
8/10/51
Metal Screen Corp. (bank check)
13,385.96
8/13/51
12/ 5/51
Metal Screen Corp. (draft)
3,457.50
8/26/52
$122,042.21
*193 The above checks for the year 1951 in the amount of $122,042.21 were not deposited in Western's bank account. Western's return for the year 1951 was prepared from its bank statements. The above sales for 1951 were not reflected in the returns of either Western or Alpirn. Commodity Account. On August 10, 1949, an account with Butler-Welsh Grain Co., Omaha, Nebraska, was opened in the name of "M. Alpirn, c/o Henry Karpf, personal, (controlled by H. Karpf)," [3] Live Stock National Bank, Omaha, with a deposit of $10,000. On December 6, 1949, there was a sale of commodities (that had previously been purchased for this account) at a profit of $5,975. On December 8, 1949, the balance of the account was closed out by a Butler-Welsh check in the amount of $15,975 (representing the deposit of August 10, 1949, plus $5,975 profit of December 6, 1949), made payable to Alpirn. The check was endorsed by Alpirn and a deposit in the amount of $15,975 was made in the bank account of Western at the Live Stock National Bank on December 12, 1949. *194 On October 3, 1951, a deposit in the amount of $15,000 was made in the account. There was a sale of commodities (which had previously been purchased for this account) with profits as follows: November 6, 1951
$ 2,717.00
December 10, 1951
4,654.50
December 10, 1951
3,228.00
Total gain
$10,599.50
Butler-Welsh normally notifies the person in whose name the account is listed of the results of transactions in the account. At December 31, 1951, the credit balance in the account was $25,599.50 (representing the deposit of $15,000 plus gain of $10,599.50). The above-mentioned commodity account belonged to Alpirn. Alpirn had knowledge of the transactions in the account. The profits produced by the trading in the account during 1949 and 1951 belonged to Alpirn. The profits in the account for the years 1949 and 1951 were not reported as income on the returns of Alpirn or Western. Part of the deficiency for the year 1951 is due to fraud with intent to evade tax. No part of the deficiency for each of the years 1946, 1947, 1948, 1949, and 1950 is due to fraud with intent to evade tax. Opinion BLACK, Judge: The respondent has determined deficiencies in income *195 tax and additions thereto for fraud for the years 1946 to 1951, inclusive, against Alpirn, who died in 1955. During the years involved Alpirn was engaged in the business of buying and selling metals under the name of Western Smelting and Refining Company. The only item of income he reported on his individual returns was a "salary" from Western in amounts ranging from $3,025 to $4,825 per year. Western, although it was not a corporation, filed corporate returns showing sales and expenses of the metals business. The Commissioner added to Alpirn's reported income "business income" in the amounts of $66,116.68, $36,586.16, $46,739.34, $32,185.21, $38,762.91, and $281,918.27, for the years 1946, 1947, 1948, 1949, 1950, and 1951, respectively. In addition, for 1951 the respondent added two items described as short-term capital gain and inventory. For the years 1946 to 1948, inclusive, the business income was described as the "net income" of Western; for the years 1949 to 1951, inclusive, it was described as being based on net worth and expenditures. The parties have agreed that the income and losses reported on the corporate returns filed by Western should be treated as the business *196 income and losses of Alpirn for those same years. But the amounts determined by the Commissioner to be business income greatly exceed the amounts returned by Western. The manner in which the Commissioner computed the "business income" of Alpirn and the details of that computation are not set out in the deficiency notice nor are they in the record. The petitioner, however, has not introduced any evidence regarding Alpirn's income except to the extent that the Commissioner has disallowed certain salary and expense payments. These disallowances, as stated previously, are not set out in the deficiency notice but the parties agree that the ones now in question are payments to Abraham, Alpirn's father, in the amounts of $2,120, $2,450, $4,200, $3,975, $4,500, and $4,500 for the years 1946, 1947, 1948, 1949, 1950, and 1951, respectively, and payments of $3,599.46 to Nell Ross in 1951. At the trial of this proceeding, one of the issues upon which considerable evidence was introduced by petitioner was as to the disallowance by the Commissioner of a dependency exemption in each of the taxable years by Alpirn for his sister, Eva Alpirn Stein. At the conclusion of the hearing, respondent's counsel *197 conceded that Alpirn was entitled to claim Eva Alpirn Stein as a dependent for each of the taxable years 1946, 1947, 1948, 1949, 1950, and 1951. Effect will be given to this concession by respondent in a computation under Rule 50. Regarding the payments to Abraham, the record shows that during the years in question he was an elderly person (he was about 78 in 1946 and died in 1954 at the age of 87); that he had had long and extensive experience in the metals business; that he was especially experienced in Western's business since it was formerly his business for many years; that he spent every day at his desk in Western's office; and that he acted as an advisor to Alpirn and occasionally made some purchases. The Commissioner contends that these payments to Abraham were of a personal nature. But he has not introduced any evidence to support this contention. And the only things in the record possibly supporting his view are the facts that Alpirn prepared Abraham's tax returns (which returned Abraham's salary as income) and the fact that Abraham's tax for some years was probably paid by a check of Western. Regardless of the inferences that might be drawn from the facts which the Commissioner *198 relies upon, we do not think they detract from the fact that Abraham performed services for Alpirn. Having performed services for Alpirn, he was entitled to compensation therefor. Although the Commissioner argues otherwise, there is nothing in the record suggesting that the amounts paid were unreasonable in amount. Certainly, from the evidence concerning such services, we think they were reasonable. Accordingly, we have found as a fact and hold that the amounts of $2,120, $2,450, $4,200, $3,975, $4,500, and $4,500, for the years 1946, 1947, 1948, 1949, 1950, and 1951, respectively, represent reasonable compensation for personal services actually rendered by Abraham to Alpirn. Regarding Nell Ross the situation is different. There is no evidence of who she was, what her duties were, or what she actually did on behalf of Western and Alpirn. In these circumstances we cannot say that the petitioners have borne their burden of proof. Accordingly, we must uphold the respondent regarding this item. Since these were the only contested items in regard to the amounts of income (and upon which the petitioner introduced any evidence), we uphold the respondent's determination in all other *199 particulars (except as agreed to by the parties) regarding the deficiencies in income tax. The remaining and principal question relates to the additions to tax for fraud. With reference to fraud, it was stipulated by the parties at the hearing as follows: "Inasmuch as we have stipulated that there was no corporation, the income that was reported under corporate returns are now to be treated as the income of this petitioner, and in connection with so treating that income, there is to be no inference of fraud from taking that income that was reported by the corporation. The net income and losses of the corporation are treated as petitioner's income and there is to be no inference of fraud therefrom." While counsel for petitioner in his opening statement did not agree to the deficiencies in tax as such, he did state that petitioner would not offer any evidence contesting the adjustments which the Commissioner had made in his determination of the deficiencies except as to the three more or less minor items which we have already discussed. Petitioner's counsel, however, made it clear that they were not in any manner conceding fraud as to any of the adjustments not contested. On the *200 contrary, they denied that there was fraud for any of the taxable years. On this question of fraud the burden of proof is on the respondent. Section 1112. He must prove that some part of the deficiency for each year "is due to fraud with intent to evade tax." Section 293(b). And in order to make a finding of fraud the evidence relating thereto must be clear and convincing. For 1946, 1947, and 1950, the record shows that the total deposits in Western's bank account, reduced by certain deposits which the respondent's agent found to represent nonincome items, exceeded the sales reported on Western's returns by about $67,300, $24,700, and $191,365.14, respectively. Respondent contends that these differences represent unreported sales and that these unreported sales are proof of fraud. Where, as here, a taxpayer has failed to keep adequate books of account as required by the regulations under section 54(a), the Commissioner must determine or verify the income from the records or sources that are available and his determination of income by reference to deposits in the taxpayer's bank account has been approved in numerous cases. See Herman J. Romer, 28 T.C. 1228, 1243-1244, *201 and cases there cited. However, as we said in Denny York, 24 T.C. 742: "the 'unexplained bank deposits' involved herein, the principal and essential part of the Commissioner's case, are not in themselves clear and convincing evidence that the return was false and fraudulent with intent to evade tax. Goe v. Commissioner, 198 Fed. (2d) 851." The difficulty in respondent's position insofar as the years 1946, 1947, and 1950 are concerned is that it is based on mere presumptions and inferences. It is, of course, true that fraud is rarely ever proved by direct evidence. However, usually there is proof that income has been omitted from the return and the question is whether it has been fraudulently omitted. Here, for the years 1946, 1947, and 1950, there is no proof that any income has been omitted. We recognize that the Commissioner has determined that petitioner did have substantial amounts of additional income for these years and that we have upheld this determination except for certain minor items. However, we have upheld this determination not because there was any proof or facts in the record showing this determination to be correct but because the petitioner, *202 who has the onus of proof, has not shown otherwise. Therefore, although we agree with respondent that the "consistent failure to report substantial amounts of income over a number of years * * * is highly persuasive evidence of fraud," it is clear that that principle is not applicable here. Cf. Kashat v. Commissioner, 229 Fed. (2d) 282, 285 (C.A. 6, 1956). Here, as we stated previously, the record is void of proof of substantial amounts of unreported income unless we convert the presumption of correctness of respondent's determination into a positive finding of fact. This we cannot do. There must be independent proof of fraud. Drieborg v. Commissioner, 225 Fed. (2d) 216, 218 (C.A. 6, 1955), and statements in the notice of deficiency do not constitute proof of facts or fraud. Oscar G. Joseph, 32 B.T.A. 1192, 1204. For the year 1948 the situation is the same, i.e., the record shows that total bank deposits, reduced by certain deposits which the revenue agent found to represent nonincome items, exceeded reported sales by about $27,300, except that the record also shows that Alpirn received a check dated October 26, 1948, representing sales proceeds *203 in the amount of $5,557.39 which was cashed by him in May 1949. However, as we view it, this additional fact adds nothing substantial to respondent's proof. This is so because we do not know whether or not this item is included in the reported sales for 1948 which amounted to about $481,700. It is true that respondent's agent testified that Alpirn told him that he (Alpirn) prepared his returns from the bank statements. If that were true, it would indicate that this item was not a reported sale since it did not appear on the bank statement. However, except for 1951 when deposits, with certain adjustments, equaled reported sales, there is nothing to indicate whether or not this was true. It certainly cannot be verified by comparing the bank statements with the return. In these circumstances, we do not think the respondent has shown fraud for the year 1948 either. For the year 1949, the situation is somewhat different. In that year, in addition to items similar to those in 1948 to which we could not attribute fraud, the record shows that Alpirn had a commodity account in which $10,000 was deposited and that the trading in that account yielded a profit of $5,975. The broker drew a check *204 for $15,975, representing the deposits and profits, payable to Alpirn. The check was endorsed by Alpirn and deposited in his bank account. Neither his return nor the return of Western included this profit as income. The $5,975 profit from this account was not large as compared to other amounts included in the returns for 1949. Alpirn, as we have already pointed out, is dead and cannot testify with reference to this item. We are not convinced from the evidence in the record that it was omitted because of fraud with intent to evade tax. We have, therefore, found there was no fraud for 1949. In 1951, the record also shows that Alpirn realized a profit from the commodity account in the amount of $10,599.50. Although he did not close out the account and receive the cash proceeds in 1951, the record shows that he undoubtedly had knowledge of the profit. Such profit would be income to him in 1951 regardless of his basis for computing income. As in 1949, the profit was not reported by him. In addition, during the year 1951 the record indicates that the reported sales on the return of Western were based on bank deposits and that the bank deposits for that year did not include the proceeds *205 of sales amounting to about $122,000. These particular sales for 1951 are listed in our Findings of Fact. We are unable to believe they were innocently omitted from Western's return for that year. The foregoing facts relating to 1951 show specific omissions of substantial amounts of income by Alpirn from his return for 1951. Certainly, the $122,000 in sales was a very substantial amount to omit. These omissions, when viewed in relation to the other facts in the record, clearly and convincingly prove, we think that the return for 1951 was fraudulent and that part of the deficiency for that year "is due to fraud with intent to evade tax." We so hold. Decision will be entered under Rule 50. Footnotes
1. All section references are to the Internal Revenue Code of 1939, as amended.↩
*. Mathematical error of $100 on return.↩
2. Respondent on reply brief states: "there is nothing in the record showing that deductions were taken in 1951 as a business expense for Nell Ross and, even assuming such deductions were taken, there is no evidence showing the amount or nature thereof or that such deductions were in fact disallowed by the respondent." However, at the hearing (p. 46) respondent's counsel stated the respondent disallowed the amount of $3,559.46 "as a nondeductible expenditure of Morton Alpirn for Nell Ross."↩
1. Total tax. ↩
2. Due after withholding.↩
3. The term "controlled by H. Karpf" means the grain company would call on H. Karpf "in the event it needed more margins to protect the account."↩