ALBERT R. MENGARELLI, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; KEITH S. RICHARDS and ESTATE OF JUDITH A. RICHARDS, DECEASED, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Mengarelli v. Comm'r
Docket Nos. 6088-75, 6739-75.
United States Tax Court
T.C. Memo 1984-177; 1984 Tax Ct. Memo LEXIS 496; 47 T.C.M. (CCH) 1473; T.C.M. (RIA) 84177; April 9, 1984. *496 John P. Fadgen, for the petitioners. John O. Kent and Michael C. Cohen, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, *497 Judge: Respondent determined the following deficiencies in, and additions to, petitioners' Federal income taxes: Addition to Tax
Petitioner
Docket No.
Year
Deficiency
Sec. 6653(b) [1]
Albert R.
Mengarelli
6088-75
1964
$147,966.84
$ 73,983.42
1965
138,289.68
69,144.84
1966
26,694.83
13,347.41
Keith S. Richards
and Estate of
Judith A. Richards,
Deceased
6739-75
1964
$357,516.49
$178,758.25
1965
301,126.64
150,563.32
1966
3,146.89
1,573.45
After concessions, [2] the issues remaining for decision are: (1) Whether petitioners had unreported income during the years in issue from wagers made at the Rendezvous Race and Sports Book; (2) whether petitioners Albert R. Mengarelli and Keith S. Richards are liable for fraud additions to tax under section 6653(b) for the years in issue; and (3) whether the statute of limitations bars assessment and collection of the deficiencies determined by respondent. *498 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Albert R. Mengarelli (hereinafter Mengarelli) and Keith S. Richards (hereinafter Richards) resided in Las Vegas, Nevada, during the years in issue and when they filed their petitions herein. Mengarelli timely filed his individual Federal income tax returns for 1964, 1965, and 1966 with the Internal Revenue Service Center, Ogden, Utah. Richards timely filed joint returns with his wife, Judith, for 1964 and 1965, and with her estate for 1966, with the Internal Revenue Service Center, Ogden, Utah. Hereinafter the word "petitioners" refers only to Mengarelli and Richards. During the years in issue petitioners owned and operated a race and sports book wagering business licensed by the State of Nevada under the name of Rendezvous Race and Sports Book (hereinafter "Rendezvous"). The Rendezvous was located at 3237 Las Vegas Boulevard South, on property owned by Mengarelli. Mengarelli also owned the apartment house and underlying property immediately behind the Renderzvous. Petitioners owned the Rendezvous as a partnership. [3] Their distributive shares of partnership income from the Rendezvous *499 during the years in issue were allocated as follows: Mengarelli
Richards
1964
30.1%
69.9%
1965
30.7%
69.3%
1966
75.9%
24.1%
The business of the Renedezvous was accepting wagers on horse races and sporting events taking place in various parts of the United States. The Rendezvous contained along one wall a long counter with a window for betting on sports and, separated by a partition, three windows for betting on horse races. At the far end of the counter, there was a separate cashier's window or "cage" approximately four to six feet from the nearest seller's window. For each working day, the Rendezvous purchased and made available on the premises "scratch" sheets for the day's races. The scratch sheets listed the horse entries for each race at each of the major tracks around the country operating that day and gave each horse listed an individual *500 number. No two horses listed on the scratch sheet for a particular day would be accorded the same number. A wallboard, located on the wall opposite the counter and betting windows, provided the same information as the scratch sheets but also included updates on race and horse changes and posted the results of previously run races. A customer at the Rendezvous could place a bet by purchasing a ticket at one of the betting windows. The ticket writer would write the wager on a printed ticket form consisting of an original and a carbon-copy duplicate. The ticket then would be stamped in a stamping machine which consecutively printed 6-digit serial numbers, the date, and the time of the bet. The Rendezvous retained the original ticket while the duplicate copy was given to the bettor. If the bettor won on a bet registered on a printed ticket that was properly stamped, he generally would turn in the duplicate copy at the cashier's window and would receive payment on the bet. If the patron lost the bet, the Rendezvous would have only the original ticket as evidence of its bet. During the period January 1, 1964 through February 19, 1966, the Rendezvous also accepted bets for which no *501 printed tickets were issued. Those bets, written on white slips of paper approximately 3" X 5" in size, were made by the Rendezvous' regular patrons and generally were handed to either Mengarelli or Richards in the cashier's cage. A bettor did not receive any receipt when making a white slip bet, nor did he pay any wagering excise tax on the bet. The purpose of the white slip betting was to avoid the payment of tax. At the end of nearly every working day, petitioners, or other Rendezvous employees acting under their control, compiled the stamped printed bet slips which had been issued on race bets received that day. On losing tickets (i.e., those tickets on which the bettor lost the bet), only the original ticket was retained. On winning tickets where a payout had been made, the Rendezvous had both the original ticket and the duplicate copy that had been turned in by the bettor and on which the amount of payout was shown. Rendezvous personnel totaled the gross wagers received that day on both winning and losing printed bet slips and then placed that total on a sheet of paper called a "summary sheet." The summary sheet also showed the amount of payouts made that day, the net *502 gaming wins or losses, and the amount of Federal wagering excise tax (10 percent) due on the gross wagers received that day. Both the winning and losing printed bet tickets were placed in a bundle and maintained by the Rendezvous in boxes relating to each month of activity. Mr. Carl I. Apple, the Rendezvous' bookkeeper, received a copy of the race summary sheet for every working day of the month. Petitioners and their employees prepared similar summary sheets for the sports bets received at the Rendezvous and registered on stamped, printed but tickets. However, the sports summary sheets were prepared only on a weekly or monthly basis, depending upon the number of sports bets placed using printed bet slips during the week or month. Like the race summary sheets, a sports summary sheet showed the sports payout made during that period and the amount of Federal wagering excise tax due on the gross wagers shown on the sheet. The stamped, printed sports bet tickets for a month, including the original ticket on losing bets and both the original and duplicate tickets on winning bets, were put in a bundle together with the summary shet and placed in the boxes containing the daily bundles *503 of printed race tickets for that month. A copy of the sports summary sheet for each month was turned over to Mr. Apple. Mr. Apple entered the amounts of gross wagers shown on the race and sports summary sheets into monthly accounting journals. He totaled the daily race and monthly sports wagers and entered the totals on the wagering excise tax returns (Forms 730) which petitioners, as partners of the Rendezvous, were required to file for every month during the years in issue. Mr. Apple prepared those returns and either Mengarelli or Richards signed them on behalf of the partnership. Petitioners filed Federal wagering excise tax returns for each of the monthly periods from January 1964 through February 1966, and paid the wagering excise tax shown to be due on each of those returns. The above-described procedures for preparation of the Rendezvous' wagering excise tax returns were followed for all months except February 1966. Mr. Apple did not use the normal summary sheets of printed bet tickets prepared at the Rendezvous for February 1966, but prepared the wagering excise tax return for that month from information provided to him by petitioners. At all relevant times, petitioners *504 followed a different procedure with respect to the white slip bets. Petitioners totaled the wagers and payouts on the white slip bets at the end of each working day. Mengarelli then took the white slips to his apartment behind the Rendezvous, where he kept them for approximately one week in order to check any claims by white slip bettors of erroneous failures to pay on winning bets.After one week, the white slips were destroyed. No information as to white slip betting was ever communicated to Mr. Apple. During the years in issue, the Rendezvous was subject to regulations of the Nevada Gaming Commission and State Gaming Control Board. The Gaming Commission's Regulation 5.050(3) provided as follows: All bets accepted by race horse books or sports pools must be on an over-the-counter basis, for cash, and consecutively numbered tickets shall be issued for each transaction. Paid stubs and copies of each ticket must be retained and shall be available for inspection by the board or its authorized agents at any time. No bets shall be placed by telephone, telegraph, messenger, or in any manner other than over the counter by the person making the bet. Paid stubs shall be filed chronologically *505 by date of payment, and all copies, including cancellations, voids, mutilations and other unused numbers shall be filed in their proper order with used numbers to constitute a complete numerical sequence for each day's business. None of the foregoing may be destroyed without specific written permission of the board. The entire amount of federal tax shall be collected from the player and adequate records thereof maintained. In 1964 the Internal Revenue Service (hereinafter the Service) began an investigation into the excise tax liability of the Rendezvous. At least two of the special agents assigned to the investigation acted undercover and observed bettors using white slips of paper to place wagers at the Rendezvous without paying the 10 percent wagering excise tax. In February 1966, the Service concluded its investigation and determined that the gross wagers shown on the white slips were not being reported for Federal wagering excise tax purposes. Pursuant to search warrants issue by the United States Commissioner in Las Vegas, Nevada, special agents entered the Rendezvous and Mengarelli's apartment in the building behind the Rendezvous on February 19, 1966, and seized various *506 bet slips and white slips of paper found on the premises. On February 20, 1966, also acting pursuant to a search warrant issued by the United States Commissioner in Las Vegas, special agents seized from the Southern Nevada Freeport Warehouse 12 boxes containing printed tickets and scratch sheets used in the Rendezvous bookmaking operations for periods from January 1964 through October 1965. The white slips found on the Rendezvous premises and in Mengarelli's apartment all showed race wagers for the week of Februar 12 through February 18, 1966. No white slips showing sports wagers were found. The total amounts shown on white slip and printed race tickets for the week of February 12 through February 18, 1966, are as follows: White Slip
Printed Ticket
Saturday, February 12
$20,032.00
$ 4,284.00
Monday, February 14
8,202.00
688.00
Tuesday, February 15
12,100.00
1,930.00
Wednesday, February 16
8,779.00
2,122.00
Thursday, February 17
11,677.00
2,109.00
Friday, February 18
10,474.00
2,822.00
Total
$71,264.00
$13,955.00
In 1969, Mengarelli was convicted of conspiring to evade or defeat the Federal excise tax imposed upon wagers (18 U.S.C. sec. 371). *507 [4] During his trial, the government introduced evidence of overt acts performed in furtherance of the charged conspiracy at various times from September 1965 through February 1966. Also in 1969, Richards was convicted upon a plea of nolo contendere of conspiring to evade or defeat the Federal excise tax imposed upon wagers. The indictment charging Richards cited overt acts occurring during the period February 1964 through February 1966.
Based upon projections from the amount of white slip bets and printed ticket wagers for the period February 12 through February 18, 1966, the Service determined that petitioners were liable for the excise tax on unreported wagers for the period February 1964 *508 through January 1966, and assessed that tax accordingly. Mengarelli paid a portion of the tax under protest and sued for a refund in the United States District Court for the District of Nevada. The government counterclaimed for the purpose of reducing the unpaid assessments against Mengarelli to judgment, and by affirmative defense alleged that he was liable for additions to tax under section 6653(b) for filing false and fraudulent wagering excise tax returns. [5]
On October 18, 1979, a jury found that petitioners were not entitled to a refund of wagering excise taxes paid and that they were liable for additional excise taxes for unreported wagers, along with interest and additions to tax under section 6653(b). The jury further found, by way of special interrogatories, the correct gross wagers which should have been reported on the Rendezvous' excise tax returns.Those wagers are as follows: Month/Year
Corrected Gross Wagers
February 1964
$63,771.00
March 1964
72,947.00
April 1964
80,922.00
May 1964
98,691.00
June 1964
80,050.00
July 1964
70,597.00
August 1964
107,325.00
September 1964
143,860.00
October 1964
192,314.00
November 1964
118,433.00
December 1964
82,762.00
January 1965
136,611.00
February 1965
101,732.00
March 1965
117,164.00
April 1965
169,798.00
May 1965
248,671.00
June 1965
237,227.00
July 1965
302,618.00
August 1965
428,190.00
September 1965
501,843.00
October 1965
477,148.00
November 1965
488,133.00
December 1965
303,256.00
January 1966
448,028.00
*509 The judgment, in the amounts determined by the jury, was entered on December 11, 1979, and is final. [6]
Petitioners reported on their monthly Forms 730 and on the Rendezvous' partnership returns (Forms 1065) for 1964, 1965, and 1966 gross wagers in the amounts of $987,755.45, $1,013,599.50, and $1,068,856.85, respectively. On their 1964, 1965, and 1966 Federal income tax returns, petitioners each reported as income from the Rendezvous the sum of his distributive share of the Rendezvous' income, as reported on its partnership returns for those years, and his salary as an employee of the Rendezvous. On June 13, 1975, respondent mailed to each petitioner a statutory notice of deficiency alleging, inter alia, unreported income for 1964, 1965, and 1966 based upon projections of the white slip bets found for the week of February 12 through 18, 1966. In an amended answer, respondent conceded that the amounts set forth in the statutory notices of deficiency were incorrect, and based his determinations *510 upon the Rendezvous' corrected gross wagers as determined by the United States District Court for the District of Nevada. Respondent determined the Rendezvous had unreported income for 1964, 1965, and 1966 of $26,328.67, $326,355.68, and $54,040.68, respectively. He computed those amounts by, first, applying the gross profit percentages obtained from the Rendezvous' Federal income tax returns to the gross receipts as adjusted to include the corrected gross wagers determined by the United States District Court for the District of Nevada. From the resulting gross profits, respondent then subtracted the deductions and the ordinary income reported by the Rendezvous on its Federal income tax returns to reach the unreported ordinary income amounts set forth above. Respondent attributed the unreported partnership income to petitioners in the same proportions as the Rendezvous' partnership returns indicate they split the reported income. ULTIMATE FINDINGS OF FACT Petitioners underreported income for all years in issue. Petitioners' underpayment of taxes for each of the years in issue were due to fraud with intent to evade tax within the meaning of section 6653(b). OPINION
*511 We must determine whether petitioners are liable for the deficiencies and additions to tax as determined by respondent. Issue 1: Income
A taxpayer is required to maintain adequate books and records to enable him to file a correct return. Sections 1.446-1(a)(4), 1.6001-1(a), Income Tax Regs. If a taxpayer fails to maintain such records, the Commissioner is authorized to reconstruct the taxpayer's income using any method which, in his opinion, clearly reflects income. Section 446(b). In the instant case, respondent relies on the doctrine of collateral estoppel to establish the correct amount of gross wagers received by the Rendezvous in 1964, 1965, and 1966, and on information furnished in the tax returns of the Rendezvous and petitioners to establish the correct taxable income of the Rendezvous and the unreported income of petitioners. Respondent bears the burden of proof with respect to the application of the doctrine of collateral estoppel. Rule 142(a). The doctrine of collateral estoppel generally applies to prevent relitigation of an issue that was determined in an earlier suit on a different cause of action. For applicability of collateral estoppel, the earlier *512 suit must have resulted in a final judgment by a court of competent jurisdiction and the parties in both suits must be identical or in privity with each other. Commissioner v. Sunnen,333 U.S. 591 (1948); Fairmont Aluminum Co. v. Commissioner,22 T.C. 1377 (1954), affd. 222 F. 2d 622 (4th Cir. 1955). We believe the elements of collateral estoppel are present herein. The decision of the United States District Court for the District of Nevada specifically addressed and determined the corrected amounts of gross wagers received by the Rendezvous for February 1964 through January 1966, an issue currently before us.[7] The parties who litigated that issue in the District Court are the same as those involved in the present controversy, see section 7422(c), and the decision of the District Court is final. Accordingly, respondent has met his burden of proof and petitioners are estopped from denying the validity of the corrected amounts of gross wagers received by the Rendezvous during February 1964 through January 1966. [8]
*513 In reconstructing petitioners' unreported income for the years in issue, respondent began with the Rendezvous' corrected monthly gross wagers as determined by the District Court. For the months not covered by the District Court decision, i.e., January 1964 and February through December 1966, respondent used the monthly gross wagers reported by petitioners on their Forms 730 for those months. Petitioners do not dispute the correctness of those amounts and, as stated previously, they are estopped from denying the validity of the amounts determined by the District Court. To the resulting yearly gross wagers, respondent applied a profit margin to determine the Rendezvous' gross income for each of the years in issue.[9] The profit margins applied were the same profit margins that the Rendezvous had on its reported gross wagers for those years. We can find nothing wrong with respondent's use of those profit margins. While it might be argued that the regular bettors placing white slip wagers were, presumably, more experienced and therefore lost a lower percentage of their bets, the evidence shows that in fact the regular bettors had a higher losing percentage. For the one period for *514 which both printed ticket and white slip bets are available (February 12 through February 18, 1966), the Rendezvous had approximately a 17 percent loss margin on the printed ticket bets but approximately an 18 percent profit margin on the white slip bets. Thus, respondent's formula for determining the Rendezvous' profit margins on total wagers is more advantageous to petitioners than any using the available evidence. After computing the Rendezvous' corrected gross profit for 1964, 1965, and 1966, respondent determined corrected income for the partnership by subtracting deductions claimed by it on its income tax returns. There is no evidence in the record that the Rendezvous had any deductions attributable to white slip betting which it did not claim. We therefore approve respondent's use of those deductions. Respondent subtracted the reported income from the corrected income for each year to determine the unreported partnership income, and attributed *515 such income to petitioners in the same proportions as the Rendezvous' partnership income tax returns indicate they split the reported income. There was no evidence to the contrary. Petitioners maintained no records with respect to the white slip bets accepted by the Rendezvous. We find that respondent's method of reconstructing the income attributable to those bets and of apportioning that income among petitioners is justified. Section 446(b). Accordingly, petitioners had unreported income for the years and in the amounts as follows: Mengarelli
Richards
1964
$7,924.93
$18,403.74
1965
100,191.19
226,164.48
1966
41,016.88
13,023.80
Issues 2 and 3: Additions to Tax and the Statute of Limitations
Section 6653(b) provides for a 50 percent addition to tax where all or a portion of an underpayment is due to fraud. "Fraud," as that term is used in section 6653(b), "means intentional wrongdoing on the part of a taxpayer motivated by a specific purpose to evade a tax known or believed to be owing." Stoltzfus v. United States,398 F. 2d 1002, 1004 (3d Cir. 1968). Respondent has the burden of proving such fraud by clear and convincing *516 evidence. Section 7454(a); Rule 142(b). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F. 2d 1383 (8th Cir. 1978). Fraud will never be presumed, Beaver v. Commissioner,55 T.C. 85, 92 (1970), and the mere failure to report income is not sufficient to establish fraud. Merritt v. Commissioner,301 F. 2d 484, 487 (5th Cir. 1962). Since direct evidence of fraud is seldom available, however, respondent may meet his burden of proof through circumstantial evidence. The taxpayer's entire course of conduct may be used to establish his fraudulent intent. Stone v. Commissioner,56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner,53 T.C. 96, 105-106 (1969). Respondent relies on the record as a whole to satisfy his burden with respect to fraud. He points specifically to petitioners' recordkeeping procedures for the white slip bets. We agree with respondent that petitioners are liable for the fraud additions to tax for all years in issue for the following *517 reasons. Bettors placing bets which were recorded on printed tickets were issued receipts for those bets, which receipts were returned to the Rendezvous on bets won by the bettor. No such receipts were issued to bettors for bets made on white slips. Summary sheets of total bets and payouts on printed tickets were prepared daily for race horse betting and weekly or monthly for sports betting. No summary sheets were prepared with respect to bets recorded on white slips. The summary sheets of printed bet tickets were transmitted upon preparation to the bookkeeper, Mr. Apple, who prepared ledger sheets on which the Rendezvous' tax returns were based. No information as to white slip betting was ever communicated to Mr. Apple. Printed bet tickets were bundled on a daily basis for horse race bets and a monthly basis for sports bets. Those bundles were stored in boxes either at the Rendezvous or at the Southern Nevada Freeport Warehouse. White slip bets, on the other hand, were stored at Mengarelli's apartment behind the Rendezvous to the extent they were stored at all. The bundles of printed tickets were retained for a period of at least two years. White slip bets were retained for *518 only one week, then destroyed. Moreover, the record contains evidence of other conduct on the part of Mengarelli and Richards which is indicative of fraud. For example, bets on printed tickets were placed at the sellers' windows with a Rendezvous employee. White slip bets were made only at the cashier's window and generally were placed with either Mengarelli or Richards. Any person walking in off the street could place a bet on a printed ticket at the Rendezvous. To the contrary, only regular customers whom presumably petitioners trusted could place white slip bets. The evidence clearly demonstrates consistent and substantial understatements of income, acts of concealment, and inadequate records for all the years in issue. It is well established that a consistent failure to report substantial amounts of income over a number of years is evidence of fraudulent intent. Gromacki v. Commissioner,361 F. 2d 727 (7th Cir. 1966), affg. a Memorandum Opinion of this Court. Romer v. Commissioner,28 T.C. 1228 (1957). The fact that petitioners failed to disclose all of the Rendezvous' wagering income to the individual who prepared their partnership *519 returns is further evidence of their intent to conceal income and evade taxes. Farber v. Commissioner,43 T.C. 407 (1965). In addition, petitioners' failure to maintain adequate records with respect to their betting operation is evidence of fraudulent intent to evade taxes. Parsons v. Commissioner,43 T.C. 378 (1964). On these facts, we hold that respondent has proven by clear and convincing evidence that petitioners are liable for the fraud additions to tax for all years in issue. Having found that petitioners filed false and fraudulent returns for all years in issue with the intent to evade taxes, respondent's notices of deficiency clearly were not barred by the statute of limitations. See section 6501(c)(1) and (2). Due to respondent's concessions, Decisions will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Respondent concedes that the amounts of unreported income for the Rendezvous Race and Sports Book as set forth in the statutory notices of deficiency are incorrect and should be reduced to the amounts stated in respondent's amended answer. Respondent also concedes that petitioner, Estate of Judith A. Richards, is not liable for the section 6653(b) additions to tax for the years 1964, 1965, and 1966.↩
3. Petitioners' partnership interests varied depending upon, among other things, the amount of "bankroll" each had available to put into the Rendezvous' operation. Sometime in 1966, Mengarelli purchased Richards' partnership interest and thereafter operated the Rendezvous as a sole proprietorship.↩
4. Mengarelli appealed his conviction to the United States Court of Appeals for the Ninth Circuit which affirmed his conviction, Mengarelli v. United States,426 F. 2d 985 (9th Cir. 1970), cert. denied 400 U.S. 926 (1970), as well as the denial of his petition for writ of habeas corpus, Mengarelli v. U.S. Marshal,476 F. 2d 617 (9th Cir. 1973), affg. sub nom. Mengarelli v. United States,325 F. Supp. 358↩ (D. Nev. 1971).
5. While the stipulation of facts refers to the Service's conterclaim against Mengarelli only, it is clear from the stipulation that Richards also was a party to that action.↩
6. Petitioners appealed the judgment to the United States Court of Appeals for the Ninth Circuit. The judgment was affirmed by an unpublished opinion filed November 4, 1981.↩
7. The fact that the action before the United States District Court for the District of Nevada involved excise rather than income taxes is immaterial. See Strong v. Commissioner,7 T.C. 953↩ (1946). 8. Petitioners filed no brief and thus made no arguments. Petitioners' counsel, however, stated at the onset of trial that he would prove respondent's determinations were arbitrary, capricious, and unreasonable on the ground that the determinations were computed from projections of wagering income for a 3-year period based upon white slip wagers for only one week. We note that, independent of our application of collateral estoppel, respondent's use of projections of Rendezvous' gross wagers was reasonable. See Gordon v. Commissioner,572 F. 2d 193 (9th Cir. 1977), and the cases cited therein at 195, n. 1, affg. on this issue 63 T.C. 51 (1974) and 63 T.C. 501↩ (1975).
9. "Profit margin" refers to the percentage of gross wagers not returned to bettors in the form of payouts on winning bets. Respondent used the following profit margins: 15 percent (1964); 13 percent (1965); and 12 percent (1966).↩